1   COOLEY LLP
    MICHAEL G. RHODES (116127)
2   (rhodesmg@cooley.com)
    WHITTY SOMVICHIAN (194463)
3   (wsomvichian@cooley.com)
    DREW KONING (263082)
4   (dkoning@cooley.com)
    101 California Street, 5th Floor
5   San Francisco, CA 94111-5800
    Telephone:    (415) 693-2000
6   Facsimile:    (415) 693-2222

7   Attorneys for Plaintiff
    PHOENIX TECHNOLOGIES LTD
8

9                      UNITED STATES DISTRICT COURT

10                    NORTHERN DISTRICT OF CALIFORNIA

11

12

13                                          | Case No.

14  PHOENIX TECHNOLOGIES LTD, a
    Delaware Corporation.                   | **COMPLAINT FOR:**

15                                          |   **A. COPYRIGHT INFRINGEMENT;**
                    Plaintiff,              |   **B. CONTRIBUTORY INFRINGEMENT
16                                          |       OF COPYRIGHTS;**
            vs.                             |   **C. BREACH OF CONTRACT.**
17
    VMWARE, INC., a Delaware Corporation    | **DEMAND FOR JURY TRIAL**
18
                    Defendant.              | Trial Date:   Not Yet Set
19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1.      This case arises out of Defendant VMware, Inc.'s ("VMware") unauthorized use of certain computer programs that Plaintiff Phoenix Technologies Ltd. ("Phoenix") licensed to VMware for limited purposes.

2.      Phoenix is a pioneer in the computing industry, and its BIOS (Basic Input/Output System) programs have played a key part in personal computers ("PCs") for over three decades. When VMware began to develop its first virtualization software products in 1998, it turned to Phoenix to license the BIOS it needed.

3.      On March 3, 1998, the parties entered into a master license agreement (the "Original MLA") in which Phoenix licensed its PhoenixPICO BIOS programs to VMware, subject to the express limitations that the programs be used only in VMware products that run:

(a)      on standard PC platforms with a standard PC operating system;

(b)      with a specified processor and chipset; and

(c)      with systems supporting up to two processors.

4.      These limitations reflected VMware's intended use of the BIOS programs in their initial virtualization products, which were designed to run on standard PCs.

5.      However, VMware has used and continues to use the licensed programs beyond the agreed limitations, by incorporating them into VMware products specifically designed for use with *servers* as opposed to standard PCs, which:

(a)      do not run on any standard PC operating system and are designed instead to operate using a proprietary VMware host;

(b)      support processors and chipsets beyond those specified in the parties' agreements; and

(c)      support multiple processors beyond the specified limitations.

6.      These uses constitute an infringement of Phoenix's copyrights in its BIOS programs and a breach of VMware's limited license.

7.      Despite multiple opportunities, VMware failed to inform Phoenix of its actual use of the licensed programs.  Each time the parties amended the Original MLA from 2001 to 2005,

1    VMware agreed to the same limitations described above.  At no time did VMware seek to amend

2    the parties' agreement to allow it to use the licensed programs in products designed for servers.

3        **8.**    In amendments in 2003 and 2005, Phoenix granted fully paid-up licenses for

4    certain BIOS programs, and in the 2005 amendment, Phoenix removed VMware's royalty

5    reporting obligations at VMware's request.  Phoenix agreed to these terms based on the mutual

6    understanding that the licensed program would be used only in specific VMware products

7    approaching their end-of-life.  VMware did not seek further licenses from Phoenix after 2005

8    and did not inform Phoenix that it was in fact using the licensed program in an expanding line of

9    server-related products.

10       **9.**    These circumstances led Phoenix to believe that VMware complied with its

11   agreements and limited its use of the licensed program as specified.

12       **10.**   However, not only has VMware been using Phoenix's BIOS programs in

13   violation of its limited license, but it has and continues to profit greatly from its misuse.  In 2005,

14   VMware's total revenue was $387 million, and has since increased by double-digit percentage

15   points almost every year.  In 2014, VMware's total reported revenue exceeded $6 billion.  A

16   substantial portion of this revenue derives from VMware's server-related products that

17   incorporate Phoenix programs in unauthorized and infringing ways.

18       **11.**   Phoenix brings this Complaint to stop VMware's unauthorized use of Phoenix's

19   BIOS programs and to compensate Phoenix for VMware's past misuse.

20                                    **PARTIES**

21       **12.**   Phoenix is a corporation organized and existing under the laws of the State of

22   Delaware, with its principal place of business in California within this District.  Since its

23   founding in 1979, Phoenix has been at the forefront of innovation, developing system software

24   that allows the core elements of PCs to work together.  Over thirty years ago, Phoenix helped

25   launch the PC industry with its original BIOS product.  It is estimated that Phoenix products are

26   incorporated into hundreds of millions of computing devices.

27       **13.**   Defendant VMware is a corporation organized and existing under the laws of the

28   State of Delaware, with its principal place of business in California within this District.  Founded

1  in 1998, VMware is a software company that provides virtualization software, among other
2  products and services.

3  **JURISDICTION AND VENUE**

4      **14.**    This is an action for copyright infringement arising under the copyright laws of
5  the United States, Title 17, United States Code.  Accordingly, this Court has jurisdiction over
6  Phoenix's claims by reason of 28 U.S.C. § 1338(a) and 28 U.S.C. § 1331.

7      **15.**    Phoenix's claim for breach of contract arising under state law is sufficiently
8  related to Phoenix's copyright infringement claims such that it forms part of the same case or
9  controversy under Article III of the United States Constitution.  Thus, this Court has
10  supplemental jurisdiction over these state law claims by reason of 28 U.S.C. § 1367.

11      **16.**    Venue is proper in the Northern District of California under 28 U.S.C. §§ 1391
12  and 1400(a) because a substantial part of the events or omissions giving rise to Phoenix's claims
13  occurred in this district and VMware's principal place of business is located in this district.

14      **17.**    This District is also the proper venue because the Original MLA expressly
15  provides for jurisdiction and venue in California.

16  **INTRADISRICT ASSIGNMENT**

17      **18.**    This is an Intellectual Property Action to be assigned on a district-wide basis
18  pursuant to Civil Local Rule 3-2(c).

19  **BACKGROUND**

20  **Phoenix BIOS**

21      **19.**    As noted, Phoenix's primary products are BIOS programs.  Generally speaking,
22  BIOS is a built-in program (firmware) in a computer that facilitates the initial booting process of
23  the computer.  BIOS allows a computer's microprocessor to start the computer's operating
24  system.  BIOS also manages the data flow between the computer's operating system and
25  attached devices (such as a hard disk, keyboard, mouse, printer, or other devices) and ensures
26  that these components work together.

27      **20.**    Every BIOS is specifically designed to work with a particular microprocessor
28  (also known as a central processing unit or "CPU" or "processor") and its complementary

system chipset(s). The CPU is the "brain" of a computer and is the part of the computer that processes software requests and high-level computer functions. The chipset is a specialized chip or series of chips and associated circuity designed to function with, and optimize the performance of, a specific computer device. The chipset acts as a communications hub and traffic control center managing the data flow among the CPU, peripherals, and memory.

21. Like other BIOS, Phoenix's BIOS is designed for a specific platform that typically supports a specific processor, and various chipsets that work in conjunction with that specific processor.

22. Phoenix's BIOS products have evolved over the years. One of its most successful product lines was PhoenixPICO BIOS, which was developed for use in embedded/industrial devices and uses compression technology to enable more features in less ROM space. PhoenixPICO BIOS is derived from the "Phoenix BIOS 4.0 Base" code, as further discussed below.

23. Phoenix licenses its BIOS programs in two primary ways. The first is to license "object code," which is machine readable computer code that can be loaded and executed by a computer. Object code cannot be modified (absent reverse engineering, which is prohibited). The other type of license is for "source code," which is human readable code written in a programming language (such as x86 Assembly) that can be reviewed and modified by a software engineer. Source code must be "compiled" into object code before it can be used by a computer.

**VMware's Virtualization Software & Its Use of BIOS**

24. Generally speaking, virtualization refers to creating a simulated computing environment through software. For example, VMware's virtualization software allows a user to create one or more "virtual machines" that run on a single physical computer (the "host computer"). Each of these virtual machines can have a different operating system from the host computer—for instance, a user with an Apple Macintosh host computer can use VMware software to run a virtual machine that emulates a Windows-based computer. This virtual machine is a software implementation running on the Apple host computer but will behave like a Windows-based computer, with a Windows operating system capable of running Windows-

based software programs.  There are several uses for this type of virtualization technology.  For example, a software engineer could use VMware's software to create virtual machines to test his or her software on different platforms or operating systems on a single host computer.  As another example, a company can create multiple virtual machines to run on a single server, thereby conserving resources and budget.  Each of these virtual machines can run various applications continuously and in parallel without the need to purchase hardware dedicated to each application.

25.     Much in the same way a physical computer requires a BIOS program in the start-up process, each virtual machine running on a physical host computer must also use a BIOS to load the operating system and implement other necessary functions in the start-up process of the virtual machine.

### The Master License Agreements & VMware's Initial Use of Phoenix's BIOS

26.     In 1998, Phoenix and VMware entered into the Original MLA whereby VMware (as "Licensee") agreed to license the object code (the "Program") and source code for the "PhoenixPICO BIOS" program adapted to specifically support a specified processor and chipset. (The Original MLA and subsequent amendments are referred to collectively as the "MLA."). For confidentiality reasons, a copy of the MLA is not provided herein, but relevant portions are quoted herein.

27.     Under the Original MLA, VMware paid a "Source Code License Fee" for the PhoenixPICO BIOS source code that was adapted specifically to support the features of the Intel Pentium Processors and the Intel 82430MX/HX chipset (the "430MX code").  This source code license also granted VMware an option to purchase additional source code licenses for the Intel Pentium Processor for additional chipset modules supported by Phoenix.

28.     The Original MLA also required VMware to pay a "per copy" royalty for object code compiled from the 430MX code (the "430MX Program").  In exchange, VMware received a license to reproduce, have reproduced, distribute, export, and/or sublicense ("Used" or "Use" or "Using") the 430MX Program, subject to certain express limitations.

29.    First, consistent with the design of BIOS programs generally, and in line with Phoenix's practice at the time, the Original MLA specifies the type of processor and the associated chipset that the 430MX code and 430MX Program must be Used with.  As noted, the Original MLA states that the licensed object code and source code are "for Intel Pentium Processors" and "for Intel 82430MX/HX chipsets."

30.    Second, the Original MLA provides that, "[u]nless specifically provided otherwise in its Specification, each copy of a Program is provided for Use on a single central processing unit."  The Specification in the Original MLA in turn provides that the Use of the Program is "limited to systems supporting up to two processors."

31.    Third, the Original MLA restricts the Use of the licensed Program to distribution only with and/or incorporation into certain VMware products that meet the definition of "Licensee's Products," which is defined as:

> [VMware's] software that incorporates and uses the Programs **_and that_**
> **_runs on standard PC platforms with a standard PC operating system_**.
> Licensee's Products specifically excludes any products shipped on a PC
> board or shipped as ROM based products.

(emphasis added).

32.    Fourth, the Original MLA restricts the Use of the 430MX code to a certain specified physical location in Palo Alto, California.

33.    The restriction that the licensed Program be used only in VMware products "that runs on standard PC platforms with a standard PC operating system" reflects the parties' understanding of VMware's anticipated uses of the Program.  At the time the parties entered into the Original MLA in 1998, VMware was developing its first virtualization software product, which was designed to run on standard PCs.  When this VMware product was launched in 1999,

VMware described it as "a thin software layer that functions as a virtual machine monitor *on a standard PC.*"[1] (emphasis added).

34.     The requirement that VMware's software "run[] on standard PC platforms with a standard PC operating system" is repeated throughout the Original MLA through the use of the defined term "Licensee's Products."  For example, in the Original MLA, the parties agreed that the Program (1) can be used "*solely for use with and/or incorporated into Licensee's Products,*" (2) can be provided to third parties "*solely for the purpose of copying said Program for use with and/or to be incorporated into Licensee's Products,*" and (3) "may not be sublicensed, sold, or otherwise distributed separately from *Licensee's Products.*" (emphasis added).

35.     Similarly, the Original MLA limits the use of the licensed source code "for the purposes of understanding the Programs, making Modifications thereto, and creating assembled and compiled object code versions of such modified Source Code for incorporation into and distribution and sublicensing *with Licensee's Products pursuant to the terms and conditions of this Agreement*."  (emphasis added).

36.     To further limit VMware's Uses and maintain the confidentiality of the 430MX code, the Original MLA (a) limited VMware's use of the source code to internal use at a specified VMware facility located in Palo Alto, California, (b) required VMware to notify Phoenix in writing if the location changed or additional sites were needed, and (c) contemplated additional license fees should VMware desire to move or expand the facilities in which it used the 430MX code.  At no time did VMware provide notice to Phoenix that it intended to change the physical location for use of the source code or that it needed additional locations.

37.     Under the Original MLA, VMware could not "sublicense or otherwise reproduce or distribute" the source code itself, although it could compile the source code into object code for incorporation into and distribution with Licensee's Products, as noted above.  In this latter

---

[1] https://web.archive.org/web/19991117165951/http://vmware.com/products/products.html

Cooley LLP
Attorneys At Law
San Francisco

scenario, the Use of the object code as compiled from the source code (whether modified or not) was also subject to payment of License Fees on a "per copy" basis.

38.     VMware also agreed in the Original MLA to embed copyright notices for the licensed Programs in a way that these notices would be displayed on the post screen or sign-on message of the Programs.

39.     The Original MLA had an initial term of two years and automatically renewed for additional one-year terms unless terminated.

40.     As noted above, after the parties entered into the Original MLA, VMware launched its first virtualization software product in 1999, which was designed to run on standard PCs.

**Subsequent Amendments & VMware's Unauthorized Uses**

41.     In April 2000, the parties amended the Original MLA to allow VMware to license the 430MX Program at a reduced "per copy" royalty for an additional period of one year, provided that VMware pre-paid Phoenix for a specified number of units.

42.     The parties next amended their agreement in June 14, 2000 (the "June 2000 Amendment"). The June 2000 Amendment provided a license to VMware for source code identified as "PhoenixPICO BIOS Chipset Source Module for the Intel Pentium Processor and the Intel 440BX Chipset" (the "440BX code"). As with the 430MX code licensed under the Original MLA, the 440BX code was licensed for Use only with a specific processor and a specific chipset and at a specific location. Specifically, the June 2000 Amendment provided that the 440BX code was "licensed for use only in systems based on the Intel Pentium Processor and the Intel 440BX Chipset."

43.     The June 2000 Amendment further specified that VMware's use of the 440BX code was limited to a specified VMware facility located at a different location in Palo Alto, California. VMware was required to notify Phoenix in writing if the location changed or additional sites were needed, and to pay an additional license fee if different or additional sites were requested. At no time did VMware provide notice to Phoenix that it intended to change the physical location for use of the source code or that it needed additional locations.

44.     In addition, the June 2000 Amendment specified that VMware was permitted to use the 440BX code "solely for the purposes specified in Section 2.5 of the [MLA]," which allows VMware to compile the source code into object code for incorporation into VMware products, but only if those products meet the definition of "Licensee's Products."  Consistent with the Original MLA, the parties understood and agreed that if VMware compiled the 440BX code into object code (the "440BX Program"), it would be obligated to pay License Fees on a "per copy" basis.

45.     In March 2001, the parties again amended the Original MLA to extend the term of the royalty-bearing license for the "PhoenixPICO BIOS" Program, which now included both the 430MX Program previously licensed under the Original MLA and the 440BX Program licensed under the June 2000 Amendment ("March 2001 Amendment").  This amendment provided that, except as specified in the amendment, the limitations of the Original MLA would continue to apply, including the limitations imposed by the definition of Licensee's Products. The March 2001 Amendment had a one-year term.

46.     Despite renewing its agreement to Use the licensed Program only in products that run on "standard PC platforms with a standard PC operating system," VMware launched two software products in 2001 specifically intended for use in ***servers***.  These new software products, called "GSX" and "ESX," provided a number of enterprise-level functions.  For example, both GSX and ESX allowed users to replace multiple physical servers (*e.g.*, separate email and website servers used by a company) with virtual servers running on a single (larger) physical server, thus allowing the user to reduce costs and increase the utilization of existing hardware.

47.     These new products differed from VMware's existing software for use in standard PCs, in several ways:

(a)     These products ran on servers, not standard PCs.[2]

_____

[2] There are many differences between standard PCs and servers.  The main differences are that servers generally run more powerful hardware designed for applications to run 24/7 and utilize operating systems "tuned" for servers, such as ESX, VMware's own proprietary operating system.  Servers also typically serve multiple users (called clients) who can simultaneously access

**(b)**      The new server-related products supported multiple processors, with GSX supporting up to four processors and ESX supporting up to eight processors.[3]

**(c)**      The ESX server product operated without any operating system on the host server, by using its own VMkernel[4] instead.  This method of operation is known as "bare-metal" and is illustrated in the graphic from VMware below (right hand side), which graphically depicts the VMware products operating without any host operating system. [5]



**Hosted Architecture**

- Installs and runs as an application
- Relies on host OS for device support and physical resource management



**Bare-Metal (Hypervisor) Architecture**

- Lean virtualization-centric kernel
- Service Console for agents and helper applications

**48.**      On information and belief, each copy of VMware's GSX and ESX products used a 440BX Program, which was initially licensed to VMware under the June 2000 Amendment and was subject to the restrictions as expressly set forth in the MLA.[6]

**49.**      The Use of the 440BX Program in VMware's GSX and ESX server products breached the MLA and infringed Phoenix's copyrights for multiple reasons:

---

a server's resources.  Servers also typically have different hardware than desktops, with faster and better quality parts and more redundancy.
[3] https://web.archive.org/web/20010605122601/http://www.vmware.com/products/server/.
[4] A microkernel is the near-minimum amount of software that can provide the mechanisms needed to implement an operating system.  VMkernel is VMware's proprietary microkernel.  *See* http://www.vmware.com/files/pdf/ESXi_architecture.pdf
[5] http://www.vmware.com/pdf/virtualization.pdf (accessed Mar. 11, 2015.)
[6] In the event that Phoenix's ongoing factual investigation or discovery reveal that Infringing Products have also included Phoenix's 430MX Program, Phoenix reserves the right to assert additional claims based on VMware's unauthorized uses of that Program.

**(a)**    First, neither GSX nor ESX were Licensee's Products because they were both designed to run on servers instead of "standard PC platforms."

**(b)**    Second, ESX used its own host kernel without an operating system and was thus not compatible with "standard PC operating systems," as further required under the definition of Licensee's Products.

**(c)**    Third, both products supported processors other than the Intel Pentium processor, in violation of the limitation set forth in the MLA.

**(d)**    Fourth, both products supported multiple processors beyond the limitation of two processors as set forth in the MLA.

50.    After the launch of VMware's GSX and ESX server products, the parties amended the MLA again in 2002 (the "2002 Amendment").  The 2002 Amendment involved the same Programs that had been licensed before and extended the term of the license for another year.  In the course of this amendment, VMware did not disclose its Use of the 440BX Program beyond the permitted scope and never sought to modify the MLA to permit Use of the 440BX Program beyond the existing limitations.  Instead, VMware agreed in the 2002 Amendment that its license would continue to be subject to "each and every provision of the Prior Agreement [the Original MLA]," including the requirement that the licensed Programs be used only in Licensee's Products.  VMware's reaffirmati on of these limitations in 2002 led Phoenix to reasonably believe that VMware was restricting its Use of the licensed Programs as agreed by the parties, when in fact VMware was Using the Programs in GSX and ESX and other server-related products.

51.    In 2003, the parties agreed to a fully paid-up license for VMware to Use an unlimited number of copies for the "object code version of the PhoenixPICO BIOS Program," for Use "solely … with the Intel Pentium Processor and Intel 82430MX/HX Chipset" (the "2003 Amendment").  Like prior amendments, the 2003 Amendment provided that "[e]xcept as expressly set forth herein," the amendment was "subject to each and every provision of this Prior Agreement [the Original MLA]," including the definition of Licensee's Products.  (*Id.*)

52.     Phoenix agreed to provide a fully paid-up license in the 2003 Amendment, rather than renew again on a royalty-bearing basis, because Phoenix understood that VMware's further Use of the 430MX Program would be limited to certain VMware products that were nearing their end-of-life.

53.     In the parties' discussions regarding the 2003 Amendment, VMware never disclosed, and never sought an agreement for, its Use of the 440BX Program beyond the permitted scope of Licensee's Products and the other restrictions of the MLA.  In fact, the 2003 Amendment did not address the Use of the 440BX Program at all and the 2003 Amendment was related only to the Use of the 430MX Program.

**VMware's Misleading Admissions & The 2005 Amendment**

54.     On or around July 19, 2005, VMware admitted to Phoenix for the first time that it had been Using the 440BX Program in an unauthorized manner—but it did so in an incomplete and misleading manner that further obscured the full extent of its violations.

55.     On or around July 19, 2005, a VMware employee contacted Phoenix to disclose that an internal audit by VMware had shown that VMware was violating the MLA.  Specifically, VMware admitted that it had been distributing its products that incorporated the 440BX Program without paying Phoenix the required "per copy" royalties.

56.     This admission reflected VMware's express understanding that the MLA did not permit unlimited Use of the 440BX Program in all VMware products.  Instead, as VMware acknowledged, the scope of its permitted uses were limited as specified in the MLA, including the restriction of Use with a specifically identified chipset.  VMware's unsolicited outreach in 2005 also demonstrated VMware's understanding that it was obligated to self-identify and disclose to Phoenix and pay for any unauthorized Uses not permitted by the MLA.

57.     In an effort to justify its unauthorized Use, VMware claimed that the 2003 Amendment was intended to cover the Use of the 440BX Program, and that the express limitation regarding the "Intel 82430MX/HX Chipset" was an "error" that did not accurately

reflect the parties' intent.  Based on that assertion, VMware asked that the 2003 Amendment be "corrected" to add a reference to the Use of the 440BX Program.

58.    In response, Phoenix (a) explained that the 2003 Amendment correctly reflected the parties' agreement, (b) rejected the proposal to amend the 2003 Amendment, and (c) told VMware that it had to compensate Phoenix for any VMware products that Used the 440BX Program for which "per copy" royalties had not been paid.

59.    In an effort to resolve the parties' dispute, Phoenix proposed that VMware pay a one-time license fee for its prior unauthorized Uses of the 440BX Program.  This amount was based on information that VMware provided to Phoenix regarding the quantity of VMware products that had been Used in violation of the MLA.  On information and belief, the information that VMware provided was false and misleading because it did not accurately reflect, and thus concealed, the full extent of VMware's unauthorized Uses of the 440BX Program, including VMware's Use and intended continued Use of the 440BX Program in its server-related products.

60.    In addition to the proposed payment for VMware's prior Uses, Phoenix proposed that VMware pay a modest, five-figure sum for a fully paid-up license for future Use of the 440BX Program.  This amount was based on projections provided by VMware regarding its anticipated future Use of the 440BX Program.  On information and belief, these projections failed to disclose, and thus concealed, the full extent of VMware's ongoing and anticipated Use of the 440BX Program, including any Use in its server-based products.

61.    Phoenix explained to VMware that its five-figure offer for a fully paid-up license was based on the information and projections provided by VMware.

62.    On information and belief, it was apparent to VMware in these discussions that (a) Phoenix was unaware of VMware's ongoing unauthorized Use of the 440BX Program in its server-related products, and (b) that Phoenix's offer was predicated on a mistaken understanding (induced by VMware) of the extent of VMware's infringing Uses.

63.     In these discussions VMware did not disclose, and thus concealed, that it was currently Using the 440BX Program in the GSX and ESX products and intended to continue Using the 440BX Program in future versions of its software for servers.

64.     Following further negotiations, VMware accepted Phoenix's proposal, as laid out above, and the parties agreed on another amendment to the MLA (the "2005 Amendment").  In the 2005 Amendment, VMware agreed, again, that the 440BX Program was licensed "solely for use with and incorporation into Licensee's Products."   This agreement caused Phoenix to reasonably believe that VMware would Use the 440BX code only in VMware products that run on "standard PC platforms with a standard PC operating system" and concealed VMware's ongoing Use of the 440BX Program in its server-related products.

65.     VMware also negotiated that it would no longer "be obligated to provide royalty reports to Phoenix" as previously required under the MLA, further reflecting the parties' mutual understanding that VMware's Uses would be limited to specific VMware products approaching their end-of-life.

66.     If VMware had disclosed its intention to Use the 440BX Program in server-related software products that do not run on "standard PC platforms with a standard PC operating system," Phoenix would not have agreed to the terms of the 2005 Amendment.  In particular, Phoenix would never have offered or agreed to a fully paid-up license for a modest five-figure sum had it known that VMware intended to Use the 440BX Program—not in an isolated product line that was nearing its end-of-life as discussed among the parties—but in virtually all of the server-related products that have become the core of VMware's business since 2005.

**VMware's Breaches and Infringements**

67.     VMware's breaches of the MLA and its infringements of Phoenix's copyright have continued and remain ongoing to this day.

68.     VMware's unauthorized and infringing Uses include, but are not limited to, its Use of the 440BX Program (or derivatives thereof) in VMware vSphere, VMware ESX,

VMware ESXi, GSX Server, VMware Server and other VMware products that incorporate these technologies (the "Infringing Products").[7]  VMware introduced the different Infringing Products at different points in time beginning no later than 2001.  These Infringing Products violate the MLA for at least the following reasons:

      **(a)**  They are not "Licensee's Products" because they are designed to run on servers instead of "standard PC platforms;"

      **(b)**  Certain VMware server products are not "Licensee's Products" because they operate with their own host kernel, without a host operating system, and are thus not compatible with "standard PC operating systems;"

      **(c)**  They support processors other than the Intel Pentium processor, in violation of the limitation set forth in the MLA.

      **(d)**  They support multiple processors beyond the limitation of two processors as set forth in the MLA.

      **69.**  A separate instance of breach and infringement occurred each time VMware introduced a new Infringing Product to users and each time it distributed, sold, or licensed a copy of an Infringing Product.  On information and belief, further instances of breach and infringement occurred each time a virtual machine was created using an Infringing Product, because each virtual machine uses its own copy of a Program to start up and run the virtual machine and associated operating system.  The distribution of a single copy of an Infringing Product can therefore lead to hundreds (or potentially thousands) of instances of the Program being copied and used in an unauthorized way.

      **70.**  The Infringing Products account for a substantial majority of VMware's overall sales and revenue.  VMware has stated repeatedly in its 10K reports that a "large majority of its

---

[7] The full extent of VMware's unauthorized Uses of the licensed programs cannot be known without discovery, and Phoenix reserves the right to include additional VMware products (or infringing Uses) as part of its claims for breach of contract, copyright infringement, and contributory infringement asserted herein.

total revenue comes from its server virtualization products including its flagship VMware vSphere product line" that was launched in 2009. (*See* VMware's 10-K Reports, 2009-2014.)

### **Phoenix's Discovery of VMware's Breaches & Infringements**

71.     Phoenix did not discover VMware's unauthorized and infringing Uses of the 440BX Program until October 2014, when a Phoenix customer asked Mr. Jonathon White, Director of Customer Engineering at Phoenix, to perform certain specialized modifications within a virtual machine using a VMware product. Mr. White had not been asked to do this type of modification before, and had not previously installed or configured a VMware product. In implementing these modifications, Mr. White accessed the BIOS set-up utility and discovered that the default BIOS within the virtual machine was a Phoenix Program. Separately, after installing an operating system onto the virtual machine, Mr. White opened the Windows device manager and observed that the virtual machine was using an Intel Core i7 processor. Mr. White was not familiar with the Program supporting the Intel Core i7 processor and made certain inquiries based on his observations. This process ultimately led to Phoenix discovering VMware's unauthorized and infringing uses.

72.     Within days after this discovery, Phoenix exercised reasonable diligence by contacting VMware to gather additional information about VMware's uses and to assert Phoenix's rights under the MLA.

73.     Phoenix reasonably believed at all times before October 2014 that VMware would Use and was Using the licensed programs only as permitted by the terms of the MLA.

74.     Further, given the parties' negotiations in 2005 and pursuant to the terms of the MLA, Phoenix reasonably believed that VMware's Use of the 440BX Program would continue to be subject to the limitations of the MLA and be limited to the specific Licensee's Products that VMware led Phoenix to believe were nearing end-of-life.

75.     Phoenix also reasonably expected that VMware would continue to conduct internal audits and advise Phoenix of any potential violations of the MLA, given that VMware

had self-identified and disclosed its improper Use of the 440BX Program in 2005 (albeit in an incomplete and misleading manner).

76.    Under the circumstances, Phoenix had no reasonable cause to suspect that VMware was Using the 440BX Program in a manner that breached the MLA and infringed Phoenix's copyright until the events in October 2014, as described above.

77.    While some software developers and some IT staff at Phoenix used certain VMware products before this time, no one at Phoenix reasonably suspected that these VMware products violated the MLA or otherwise infringed Phoenix's copyrights.

78.    These individuals used VMware products for internal purposes including various forms of testing, internal applications, and in connection with operating servers that host various applications.

79.    The only Phoenix employees who were sufficiently familiar with the VMware products such that they could determine what BIOS it was using were software developers and IT personnel who (1) did not deal with licensing issues as part of their job responsibilities, (2) had no knowledge of the MLA and its specific terms, and (3) had no reasonable basis to suspect that the VMware products might violate the MLA or otherwise infringe Phoenix's copyrights.

80.    Even among these individuals, the integration of the Program in the VMware products was not readily apparent from the ordinary use of the software.  In order to view a virtual machine's guest BIOS information, the virtual console must be in use and a user must enter a specific hot key (typically F2) during the boot up process to access the BIOS set-up utility.  Most users have no reason to view or modify a virtual guest BIOS.  Indeed, with the VMware technology, the BIOS prompt screen flashes so quickly that even a user who wants to enter the BIOS set-up utility may have to try entering the hot key multiple times before successfully entering the BIOS set-up utility or have the technical understanding to force a BIOS set-up utility to come up.

81.    In the isolated instances where it became known that the Program was integrated in the VMware products, it was known only to software developers and IT personnel who had no

specific knowledge of the MLA's terms. These individuals had no reasonable basis to suspect that this use violated the MLA or otherwise infringed Phoenix's copyrights.

82.     Conversely, the Phoenix employees who were familiar with the MLA (a narrow group within legal and finance) did not know Phoenix was using any VMware server products, were not familiar with them, and were not aware that the Program was integrated into these VMware server products.

83.     There were no Phoenix employees whose job responsibilities involved both (1) familiarity with the MLA, and (2) use of the VMware products in a manner in which the use of Phoenix's BIOS would have been apparent. For these reasons, no Phoenix employees had a reasonable suspicion that VMware was violating the MLA until October 2014.

## COUNT I

### (Copyright Infringement)

84.     Phoenix incorporates by reference paragraphs 1-83 as though fully set out herein.

85.     On October 2, 2000, Phoenix obtained its copyright registration from the United States Copyright Office for the source code titled "Phoenix BIOS 4.0 Base" (the "Registered Code"), under registration number "TXu000968302/2000-10-02."

86.     The Registered Code was developed by Phoenix and contains a substantial amount of original material that is copyrightable subject matter under the Copyright Act, 17 U.S.C. § 101 et seq.

87.     Phoenix is the sole and exclusive owner of the Registered Code and enjoys the exclusive rights in the Registered Code as set forth in 17 U.S.C. § 106.

88.     Phoenix has complied with all statutory formalities of the Copyright Act with respect to the Registered Code.

89.     The 440BX Program at issue in this case is compiled from the 440BX code, which in turn incorporates substantially all of the Registered Code.

90.     Without consent, authorization, approval, or license, VMware knowingly, willingly, and unlawfully infringed on Phoenix's exclusive rights in the Registered Code.

91.     These acts of infringement include (a) modifying the 440BX code, which incorporates the Registered Code, to create derivative works beyond those allowed under the MLA, (b) compiling the 440BX code and derivatives thereof into the 440BX Program for incorporation into the VMware products beyond those allowed under the MLA, (c) unauthorized reproduction of the 440BX Program in these VMware products, and (d) distribution of those VMware products to the public—all in a manner that violates the limited license granted to VMware under the MLA.

92.     On information and belief, VMware's direct infringements are and have been knowing and willful.

93.     VMware has realized unjust profits, gains, and advantages from its infringements, and will continue to do so as long as such infringements are permitted to continue.  Phoenix is entitled to recover from VMware the gains, profits and advantages it has obtained and will obtain as a result of its acts of copyright infringement, in an amount to be proven at trial.

94.     As a direct and proximate result of VMware's direct and indirect willful copyright infringement, Phoenix has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill.  Phoenix is entitled to recover from VMware, in amounts to be determined at trial, the damages it has sustained and will sustain.

95.     Phoenix is suffering and will continue to suffer irreparable harm as a result of VMware's copyright infringements.  Phoenix has no adequate remedy at law and money damages alone will be insufficient to adequately compensate Phoenix.  Unless VMware is enjoined and prohibited from infringing Phoenix's rights and from inducing others to infringe Phoenix's rights, VMware will continue to intentionally infringe and induce infringement of Phoenix's rights.  Phoenix is therefore entitled to an injunction restraining VMware from engaging in any further such acts in violation of the United States copyright laws.

96.     VMware's infringements related to the 440BX Program, as specified herein, commenced after the copyright registration of the Registered Code on October 2, 2000 and/or the earlier copyright application for the Registered Code.  Phoenix is therefore entitled to recover statutory damages and attorneys' fees and costs under 17 U.S.C. §§ 504, 505, and 412.

97.     Phoenix learned of VMware's infringements for the first time in October 2014 and did not have a reasonable basis to suspect VMware's infringements prior to that time, for the reasons detailed above.   The statute of limitations for Phoenix's claims for copyright infringement was thus tolled and did not begin to run until October 2014 at the earliest.

## COUNT II

### (Contributory Infringement of Copyrights)

98.     Phoenix incorporates by reference paragraphs 1-83 as though fully set out herein.

99.     In addition to its own acts of direct infringement, VMware is liable for contributory infringement because it acted knowingly, and/or with unlawful purpose and intent to induce, cause, and materially contribute to the infringing acts of others, and by its conduct, caused such acts of infringement to occur.

100.     First, VMware knowingly and/or intentionally designed, distributed, and promoted the Infringing Products specifically to allow end users to create multiple virtual machines, a process which creates in each instance an unlicensed reproduction of the 440BX Program, which is compiled from the 440BX code, which in turn incorporates substantially all of the Registered Code.   VMware has therefore knowingly and/or intentionally caused the end users of the Infringing Products to infringe Phoenix's exclusive rights in the Registered Code each time they create a virtual machine.   The Infringing Products are not capable of substantial or commercially significant non-infringing use because the very purpose of these products is to enable end users to create virtual machines, which in turn leads to unlicensed reproduction and use of the 440BX Program or derivatives thereof.

101.     Second, VMware has intentionally and/or knowingly induced, caused, and enabled its OEM reseller customers (hereinafter "OEM Customers") to infringe Phoenix's exclusive rights by allowing these OEM Customers to use, copy, and/or distribute unlicensed copies of the 440BX Program, which is compiled from the 440BX code, which in turn incorporates substantially all of the Registered Code.   This includes allowing the Infringing Products to be incorporated into the OEM Customers' server hardware and other products for

Cooley llp
Attorneys At Law
San Francisco

distribution and sale to end users. The Infringing Products incorporated into OEM Customers' server hardware are not capable of substantial or commercially significant non-infringing use, because the very purpose of the Infringing Products is to enable end users to create virtual machines, which in turn leads to an unlicensed reproduction and use of the 440BX Program or derivatives thereof.

102. The infringement of each of Phoenix's rights in and to the Registered Code constitutes a separate and distinct act of infringement.

103. On information and belief, the foregoing acts of contributory infringement by VMware are and have been knowing and willful.

104. VMware's conduct constitutes contributory infringement of Phoenix's copyrights and Phoenix's exclusive rights under copyright in violation of 17 U.S.C. sections 106 and 501.

105. As a direct and proximate result of VMware's contributory infringement, Phoenix has suffered, and will continue to suffer, monetary loss to its business, reputation, and goodwill. Phoenix is entitled to recover from VMware, in amounts to be determined at trial, the damages it has sustained and will sustain.

106. Phoenix further is entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. section 505.

107. Phoenix is suffering and will continue to suffer irreparable harm as a result of VMware's contributory infringement. Phoenix has no adequate remedy at law and money damages alone will be insufficient to adequately compensate Phoenix. Unless VMware is enjoined and prohibited from inducing, causing, or materially contributing to such infringing activity by VMware's OEM Customers, VMware will continue to intentionally contributorily infringe Phoenix's rights. Phoenix is therefore entitled to an injunction restraining VMware from engaging in any further such acts in violation of the United States copyright laws.

108. VMware's acts of contributory infringement related to the 440BX Program and any derivative work commenced after the copyright registration of the Registered Code on October 2, 2000 and/or the earlier copyright application for the Registered Code. Phoenix is

therefore entitled to recover statutory damages and attorneys' fees and costs under 17 U.S.C. §§ 504, 505, and 412.

109.    Phoenix learned of VMware's acts of contributory infringements for the first time in October 2014 and did not have a reasonable basis to suspect VMware's infringements prior to that time, for the reasons detailed above.   The statute of limitations for Phoenix's claims for contributory copyright infringement were thus tolled and did not begin to run until October 2014 at the earliest.

<u>**COUNT III**</u>

**(Breach of Contract)**

110.    Phoenix incorporates by reference paragraphs 1-83 as though fully set out herein.

111.    The Original MLA and its subsequent amendments are each valid and enforceable contracts entered into by Phoenix and VMware.

112.    Phoenix performed all, or substantially all, of its obligations under the MLA, and delivered the BIOS code that VMware licensed under the MLA.

113.    All conditions required for VMware's performance under the MLA occurred.

114.    VMware has breached and continues to breach the MLA in various ways including as follows:

(a)     VMware Used the 440BX Program (or derivatives thereof) in VMware products that do not meet the contractual definition of Licensee's Products.

(b)     VMware Used the 440BX Program (or derivatives thereof) in VMware products that run on unauthorized processors, including but not limited to Intel's Core i7 processor, in violation of the MLA's terms that restricted the Use of the licensed programs to the Intel Pentium processor.

(c)     VMware Used the 440BX Program (or derivatives thereof) in VMware products that violate the limitation in the MLA providing that the Use of the licensed programs is "limited to systems supporting up to two processors."

     **(d)**     VMware has, and continues to maintain, Phoenix's licensed source code at unauthorized facilities in violation of the MLA, which restrict the Use and storage of the source code only to specifically identified locations.

     115.     Phoenix learned of these breaches of the MLA for the first time in October 2014 and did not have reasonable basis to suspect VMware's breaches prior to that time.  As such, Phoenix's claim for breach of contract did not accrue until October 2014 at the earliest.

     116.     Additionally, the statute of limitations was tolled and did not commence to run until October 2014 because VMware concealed the extent of its unauthorized use of the 440BX code and 440BX Program, and Phoenix reasonably relied on VMware's inaccurate disclosures.

     117.     As a proximate result of VMware's acts as alleged above, Phoenix has suffered actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

     **A.**     Entry of judgment holding VMware liable for copyright infringement and breach of contract;

     **B.**     An order permanently enjoining VMware, its officers, agents, servants, employees, attorneys and affiliated companies, its assigns and successors in interest, and those persons in active concert or participation with it, from continued acts copyright infringement and breach of contract;

     **C.**     An order that all copies of Infringing Products be impounded and destroyed or otherwise reasonably disposed of;

     **D.**     An order awarding Phoenix reasonable royalties related to the Infringing Products, disgorgement of profits derived from the Infringing Products, and damages resulting from VMware's copyright infringements, together with pre-judgment and post-judgment interest;

     **E.**     Alternatively, an order awarding Phoenix maximum statutory damages under 17 U.S.C. § 504(c);

     **F.**     An order awarding Phoenix its costs and attorneys' fees under 17 U.S.C. § 505; and

     **G.**     Entry of judgment holding VMware in breach of the MLA;

1    **H.**    An award of actual damages resulting from VMware's breach of the  MLA;

2    **I.**    An order requiring VMware to provide a full accounting, including the sales,

3    revenues, profits, and other benefits, that it has derived from its unauthorized and infringing acts;

4    **J.**    Any and all other legal and equitable relief as may be available under law and

5    which the Court may deem proper.

6

7    Dated: March 27, 2015                COOLEY LLP

8

9                                        */s/    Michael G. Rhodes*
                                         _____

10                                       Michael G. Rhodes

11                                       Attorneys for Plaintiff
                                         PHOENIX TECHNOLOGIES LTD

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DEMAND FOR JURY TRIAL

2      Plaintiff, Phoenix Technologies Ltd hereby demands trial by jury on all causes of action

3  and claims on which they are entitled to a trial by jury under the Seventh Amendment of the

4  United States Constitution.

5

6  Dated: March 27, 2015                    COOLEY LLP
                                            MICHAEL G. RHODES (116127)
7                                           WHITTY SOMVICHIAN (194463)
                                            DREW KONING (263082)

8

9                                           /s/      Michael G. Rhodes
                                            Michael G. Rhodes

10                                          Attorneys for Plaintiff
                                            PHOENIX TECHNOLOGIES LTD
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28