UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHOENIX TECHNOLOGIES LTD., <br>     Plaintiff, <br>   v. <br> VMWARE, INC., <br>     Defendant. | Case No. 15-cv-01414-HSG   (DMR) <br><br> **ORDER ON VMWARE'S MOTION TO COMPEL** <br> Re: Dkt. No. 79 |

In this copyright infringement case, Defendant VMware, Inc. ("VMware") moved to compel in camera review and production of documents withheld by Plaintiff Phoenix Technologies Ltd. ("Phoenix") upon its assertion of attorney-client and work product privileges. [Docket No. 79.] On April 14, 2016, following a hearing, the court granted VMware's motion in part, and ordered Phoenix to submit for in camera review documents withheld solely on the basis of the work product doctrine. [Docket No. 92 (Minute Order).] Having reviewed the documents in camera, the court now enters the following order on VMware's motion to compel production.

## I. FACTUAL BACKGROUND

### A. Phoenix's Allegations in This Lawsuit

Phoenix filed this copyright infringement and breach of contract case against VMware in March 2015. Phoenix alleges that it is a pioneer in the computing industry, and that its BIOS (Basic Input/Output System) programs have "played a key part in personal computers" for over 30 years. Compl. ¶ 2. VMware is a software company. It provides virtualization software that allows a user to "create one or more 'virtual machines' that run on a single physical computer." Compl. ¶ 24. In 1998, the parties entered into a master license agreement ("MLA") in which Phoenix licensed its BIOS programs to VMware subject to express limitations. The parties amended that agreement several times, most recently in 2003 and 2005. The 2003 and 2005

amendments were "Fully Paid-Up Licenses," also known as perpetual or "all you can eat" licenses. Gonzalez Decl., March 10, 2016 ¶ 11. In 2005, VMware had two types of virtualization products—a desktop product and server products. Phoenix concedes that the license allows VMware to use the Phoenix BIOS in VMware's desktop product, but claims that the license does not allow VMware to use the BIOS in VMware's server products.

Phoenix alleges that VMware has used and continues to use the licensed programs beyond the agreed limitations. It claims that VMware's use of the programs infringes Phoenix's copyrights in its BIOS programs and constitutes a breach of the license agreement. Compl. ¶¶ 3, 5, 6, 8.

### B. VMware's Motion to Compel In Camera Review

Phoenix withheld over 1,700 documents from production on the grounds that they constitute attorney work product and/or attorney-client privileged communications. VMware filed a motion arguing that Phoenix improperly asserted privilege as to 203 of these documents.

On April 14, 2016, following a hearing, the court partially granted VMware's motion for in camera review, holding that VMware had presented facts "sufficient to support a reasonable, good faith belief that in camera inspection [could] reveal evidence that information in the materials is not privileged." *In re Grand Jury Investigation*, 974 F.2d 1068, 1075 (9th Cir. 1992). Accordingly, the court exercised its discretion to conduct an in camera review of documents withheld by Phoenix solely on the basis of the work product doctrine. The court ordered Phoenix to re-review documents withheld on that basis, to withdraw any assertion of work product protection that was not substantially justified, and to submit for in camera review any remaining documents for which it continued to assert work product protection. The court denied VMware's motion with respect to documents withheld on the basis of attorney-client privilege, finding that the parties had not adequately met and conferred regarding those documents. [Docket No. 95 (Apr. 14, 2016 Hr'g Tr.) at 7.] Therefore, the only documents currently at issue are those withheld by Phoenix solely on the basis of work product protection.

Phoenix lodged the documents for which it continues to assert work product protection. In a cover letter to the court, it indicated that it has withdrawn its work product claim as to seven

documents.

Phoenix asserts that the documents at issue in this motion are entitled to work product protection because they were created in anticipation of this lawsuit. VMware counters that they are business-related documents that were not prepared exclusively for litigation, i.e., that they served a "dual purpose." VMware argues that the documents would have been prepared with or without the prospect of litigation and thus are not protected work product. *See Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW (EMC), 2004 WL 1878209, at *6 (N.D. Cal. Aug. 23, 2004) (describing dual purpose document analysis; citing *In re Grand Jury Subpoena, Mark Torf/Torf Envt'l Mgmt*, 357 F.3d 900, 906-10 (9th Cir. 2003)).

**C. Facts Relevant to VMware's Motion**

According to VMWare, after investment management firm Marlin Equity purchased Phoenix, it directed Phoenix's "Collections Task Force" ("CTF") to collect unpaid royalties from Phoenix customers. The three members of Phoenix's CTF are Cindy Lopez, Senior Director of Contracts and Compliance; Brian Stein, CFO; and Brigitte Paje, an order operations specialist. The CTF reports to Phoenix's CEO Rich Geruson. According to Lopez, as part of the CTF's work, Phoenix sent out letters to hundreds of customers threatening audits if they did not verify payment of all royalties due under their contracts. As a result of their efforts, the CTF entered into a number of new deals and collected millions of dollars from their customers. Gonzalez Decl. Ex. B (Lopez Dep.) 62, 165-66, 117-20, 116, 120-21; Ex. C at 6 (May 2014 report to Marlin Equity). Stein testified that Phoenix successfully reached a business resolution through negotiations with all of its customers except VMware. Gonzalez Decl., March 31, 2016 ("Supp. Gonzalez Decl."), Ex. L (Stein Dep) at 110. This included a business resolution with "Customer A"[1] for several million dollars. Gonzalez Decl. Ex. C.

As previously noted, Phoenix asserts that VMware's license allows use of the Phoenix BIOS in VMware's desktop product only. Phoenix contends that it was unaware that VMware

---

[1] The court uses "Customer A" instead of the name of the actual customer, which is filed under seal.

3

was using its BIOS in server products until October 2014, when a Phoenix engineer, Jonathon White, made the discovery.[2] Phoenix produced an email chain that begins on October 9, 2014, in which White emailed Lopez and Matthew Durbin, Vice President of Sales. The email discussed VMware's use of the Phoenix BIOS and asked, "What sort of agreement did we have on VMware on this? Are we collecting royalties?" The email chain that followed contains comments such as "maybe [VMware] got a heckuva deal" on their 2005 perpetual license, as well as Durbin's comment, "I smell money." After numerous emails about the details of VMware's license, Lopez emailed Stein, who is a fellow CTF member, stating that this was "[a]nother potential lead for unreported royalties." Gonzalez Decl. Ex. F (unredacted White email chain).[3] According to Lopez, following the White email chain, she had further discussions with White and Durbin about VMware's license. Lopez Decl., March 24, 2016, ¶ 2. On October 15, 2014, Durbin informed Lopez that he had contacted VMware to discuss the matter, and despite "several attempts to discuss the issue . . . VMware declined to speak with [them]." *Id.* at ¶¶ 3-5.

Lopez states that on November 10, 2014, she consulted Lauren Segal, Phoenix's Interim General Counsel, about "the dispute with VMware." According to Lopez, after that date, and prior to Phoenix's February 2015 retention of Cooley LLP as outside litigation counsel in this lawsuit, Segal "provided direction and guidance relating to Phoenix's investigation and analysis of VMware's use of Phoenix's BIOS." *Id.* at ¶¶ 6, 7; Segal Decl., March 24, 2016, ¶ 9. Lopez declared that she consistently provided information to Segal resulting from the investigation and analysis, and coordinated communication with other Phoenix employees at Segal's direction and with her guidance. Lopez Decl. at ¶ 7.

Segal states that she began providing legal advice to Phoenix "in connection with its investigation and analyses relating to its dispute with VMware" around November 10, 2014, and

---

[2] VMware disputes Phoenix's contention.

[3] Phoenix originally produced the email chain in entirely redacted form, except for White's initiating email, claiming that the rest of the chain constituted work product made in anticipation of litigation. On February 6, 2016, Phoenix withdrew its work product assertion for the entire White email chain and produced the unredacted version. Gonzalez Decl. Ex. F (unredacted White email chain).

4

that starting on November 14, 2014, she "continuously provided legal advice and direction to Phoenix regarding the licensing dispute." Segal Decl. at ¶¶ 2, 3. According to Segal, she "was involved in Phoenix's preparation of documents regarding the dispute with VMware, and reviewed most of the documents created by Phoenix," although she does not identify any specific documents on Phoenix's privilege log with which she was involved or that she reviewed. *Id.* at ¶ 3. Segal states that on November 14, 2014, after VMware's "last minute cancellation" of a meeting with Phoenix, she "made sure all future communications with VMware would include Phoenix's legal department," and that she "believed it was unlikely that Phoenix and VMware would informally resolve" their dispute. *Id.* at ¶ 4.

On November 14, 2014, with Segal's assistance, Lopez prepared and sent a letter under her own signature to VMware setting forth Phoenix's position that VMware's use of BIOS did not comply with the terms of its license. Lopez Decl. ¶ 8 Ex. 3. On the same date, Lopez informed Durbin in an email that the "letter should be sent from legal . . . since this is now a legal matter." *Id.* at ¶ 9, Ex. 4. VMware responded to Phoenix's November 14, 2014 letter on December 2, 2014. Lopez Decl. at ¶ 10, Ex. 5. Its counsel set forth the response to Phoenix's assertion that VMware was not in compliance with the MLA. Counsel wrote, "[a]ssuming that there were any merit to Phoenix's claim (which there is not), such claim would nevertheless be barred . . . even if it could muster a valid claim (which it cannot), Phoenix would be legally prohibited from bringing such a claim because it substantially delayed in raising the issue." *Id.* Segal asserts that the tone of VMware's December 2, 2014 letter and VMware's "continued refusal to provide information that Phoenix had requested relating to its use of Phoenix's BIOS reaffirmed her earlier belief that this matter would not likely be resolved informally outside of litigation." Segal Decl. ¶ 5. On December 5, 2014, Segal began searching for outside counsel to pursue Phoenix's claims against VMware. *Id.* at ¶ 6. Lopez states that until Phoenix's dispute with VMware arose, the CTF had not previously consulted Segal to obtain legal advice on any task force-related matters. *Id.* at ¶ 18.

On November 26, 2014, a couple weeks after Lopez had sent her initial letter to VMWare, Stein emailed Durbin, asking "status on VMware collections?" Gonzalez Decl. at Ex. Q. Roughly two months later, on February 2, 2015, Peter Chung of Marlin Equity wrote to Stein and Geruson

seeking an update on VMware. In his reply, Stein described Phoenix's communications with VMware, and explained that Phoenix was waiting for "data on usage" necessary to get "a sense of magnitude." Gonzalez Decl. Ex. J. Stein also noted, "[s]ame process as with [Customer A]." *Id*. On February 3, 2015, Durbin wrote to VMware, asking for data and noting that "[i]t's approaching 2 months since I contacted you about this after VMware legal agreed to move forward on resolving this licensing situation amicably and quickly." *Id*. at Ex. H.

The privilege log indicates that the documents at issue in this dispute all fall within a seven-day period between February 4 and 10, 2015. Phoenix issued a litigation hold notice on February 17, 2015.[4] It filed suit against VMware in this court on March 27, 2015.

## II. LEGAL STANDARDS

This court exercises federal question jurisdiction over Phoenix's copyright infringement claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Phoenix's pendent state law claims. "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005); *see also* Fed. R. Evid. 501, Advisory Committee Notes ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply.").

Under the work product doctrine, materials can be protected from discovery if they are prepared by or for a party or its representative in anticipation of litigation. A party representative includes the party's attorney, consultant or agent. *Visa USA, Inc.*, 2004 WL 1878209, *5 (citing *In re Grand Jury Subpoena*, 357 F.3d at 906 and Fed. R. Civ. Proc. 26(b)(3)(A)). The doctrine aims to balance the "promotion of an attorney's preparation in representing a client" and "society's general interest in revealing all true and material facts to the resolution of a dispute." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1375 (Fed. Cir. 2007) (citation and quotation marks omitted).

The work product doctrine "is 'an intensely practical one,' and thus recognizes that

---

[4] At the hearing, VMware's counsel stated for the first time that the earliest reference to a litigation hold that he could find in Phoenix's privilege log was February 17, 2015. Since VMware had not raised this issue in the moving papers, the court granted Phoenix leave to submit evidence of an earlier litigation hold. Hr'g Tr. at 23. Phoenix did not submit any such evidence.

6

'attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *Lewis v. Wells Fargo & Co.*, 266 F.R.D. 433, 440 (N.D. Cal. 2010) (quoting *In re Grand Jury Subpoena*, 357 F.3d at 907). However, "the degree to which counsel is involved in creating [a] document bears directly on whether the document was prepared in anticipation of litigation," because "attorneys are the ones who actually litigate cases, and whether or not a company involves attorney in creating a document is a telling indication about whether the document was prepared in anticipation of litigation." *Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd*., No. 13-cv-02502-JD, 2015 WL 124557, at *5-6 (N.D. Cal. Jan. 8, 2015) (quoting *United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 134-35 & n.8 (D.D.C. 2012)). Accordingly, "[t]he fact that . . . withheld documents do not involve any attorneys is a useful sign, in conjunction with other indicators, that they are not protected work product." *Largan*, 2015 WL 124557, at *4.

At times, a document may have a litigation purpose as well as a non-litigation (e.g., business) purpose. When a document serves a dual purpose, the Ninth Circuit applies the "because of" test to determine whether the document is entitled to work product protection from discovery. "Dual purpose documents are deemed prepared because of litigation if 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011) (quoting *In re Grand Jury Subpoena*, 357 F.3d at 907). This analysis requires the court to examine the totality of the circumstances and determine whether the document was prepared in anticipation of litigation and "would not have been created in substantially similar form but for the prospect of that litigation." *In re Grand Jury Subpoena*, 357 F.3d at 908 (quotation omitted). A party asserting the work product doctrine bears the burden of demonstrating that the protection applies. *See, e.g., In re Grand Jury Investigation*, 974 F.2d at 1071.

### III. DISCUSSION

VMware argues that the documents at issue are not subject to work product protection. Its primary argument is that Phoenix cannot demonstrate that the documents were prepared "because

7

of" anticipated litigation.  According to VMware, Phoenix approached its dispute with VMware in the same manner that it handled numerous other business negotiations through its CTF. Therefore, VMware argues, Phoenix's employees would have prepared the documents in "substantially similar form" pursuant to its business plan to squeeze more royalties from Phoenix's customers, regardless of the prospect (and eventual reality) of litigation.  VMware notes that none of the documents involve attorneys, and that the work product doctrine cannot be used to shield the business-related communications of non-attorneys.  In response, Phoenix argues that VMware was not a target of the CTF, and that the documents were not created in the ordinary course of business.  It asserts that all of the documents for which it claims work product protection were prepared in anticipation of this litigation, after it had involved in-house counsel in the dispute.

### A. The "Because of" Standard

As previously noted, the Ninth Circuit has adopted a "because of" standard for determining whether a document that serves both a litigation and non-litigation purpose is entitled to work product protection. *See In re Grand Jury Subpoena*, 357 F.3d at 907; *Richey*, 632 F.3d at 567-68 (citation omitted).  "The 'because of' standard does not consider whether litigation was a primary or secondary motive behind the creation of a document.  Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the 'document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]'" *In re Grand Jury Subpoena*, 357 F.3d at 908 (citation omitted).  "When there is a true independent purpose for creating a document, work product protection is less likely, but when two purposes are profoundly interconnected, the analysis is more complicated." *Id*.

In *In re Grand Jury Subpoena*, the Ninth Circuit examined whether the work product doctrine applied to documents prepared by an environmental consultant assisting an attorney in representing a client. *Id*. at 904-05.  The client, Ponderosa Paint Manufacturing, Inc. ("Ponderosa"), hired the attorney after learning that it was under investigation by the Environmental Protection Agency ("EPA") for violating federal waste management laws. *Id*. at 905.  The attorney then hired the consultant, Mark Torf, to assist him in preparing Ponderosa's

defense. *Id*. Shortly thereafter, Ponderosa used the information collected by Torf to respond to an EPA CERCLA Information Request, and Ponderosa and the EPA subsequently entered into a Consent Order by which Ponderosa agreed to dispose of potentially hazardous substances. Torf assisted Ponderosa with the cleanup effort. *Id*. at 905-06. Two years later, a grand jury investigating Ponderosa issued a subpoena to Torf for the production of records related to his work concerning the disposal of waste material by Ponderosa. *Id*. at 906. Ponderosa intervened and moved to quash the subpoena on the basis that the documents were protected work product. *Id*.

The Ninth Circuit concluded that some of the documents sought pursuant to the subpoena were "dual purpose" documents, since Torf had prepared the documents in anticipation of litigation *and* in compliance with the Information Request and Consent Order and/or in connection with the cleanup. *Id*. at 907. The court ultimately concluded that the documents had been prepared *because of* the prospect of litigation: the attorney hired Torf "because of Ponderosa's impending litigation and Torf conducted his investigations because of that threat. The threat [of litigation] animated every document Torf prepared," including the documents related to the Information Request and Consent Order and the cleanup. *Id*. at 908. The Ninth Circuit held that "[t]he documents are entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id*. at 910.

### B. The Documents at Issue

Phoenix submitted approximately 50 documents for in camera review. With one exception, (privilege log entry 1715, discussed below), the documents consist of email communications and attachments to emails dated February 4, 2015 to February 10, 2015. Many of the communications and attachments appear to have been prepared for two scheduled meetings regarding VMware: a February 5, 2015 internal meeting with Geruson and Stein, and a February 12, 2015 meeting between Phoenix and VMware. The documents can be divided into three groups.

The first group consists of emails circulating drafts of a PowerPoint presentation prepared

9

by Phoenix for the February 5, 2015 and February 12, 2015 meetings.[5] It appears that Lopez worked with Durbin, White, and a Phoenix employee named David Huang to prepare the presentation for Geruson and Stein. Notably, despite in-house counsel Segal's representation that starting on November 14, 2014, she "continuously provided legal advice and direction to Phoenix regarding the licensing dispute," Segal is not copied on any of the communications. Moreover, none of the emails reference Segal or any other attorney, nor do they copy any attorney or mention litigation at all. Most of the privilege log entries for this group state that the withheld documents reflect Lopez's mental impressions regarding the assessment of Phoenix's claims against VMware, but nothing in the documents indicates that Lopez was acting at the direction of Segal or any attorney. Instead, the emails and drafts of the presentation appear to be part of Phoenix's business strategy to obtain information regarding its licensing dispute with VMware.

The second group of documents consists of internal communications regarding Phoenix and VMware's products, pricing, and revenue. It includes a February 10, 2015 email from Lopez to Stein to which she attaches documents she found in her "archive folder" regarding Phoenix's products and pricing.[6] One of the attached documents is dated July 7, 2001, fourteen years before this litigation. The other is a spreadsheet listing "VMware pricing" and information from 2003 and 2014 price books. Lopez's email is not copied to an attorney and does not reference an attorney or litigation. There is nothing in the documents to suggest that they were prepared at the direction of an attorney in anticipation of litigation. This group also includes versions of an attachment to a February 10, 2015 email from Stein in which he forwarded data about VMware's revenue from Phoenix's consultant, IDC Research, to Geruson, Lopez, and a Phoenix employee named Dan Austin. Again, Stein's email is not copied to an attorney, and makes no reference to litigation. Another document in this group is an attachment to a February 10, 2015 email from a

---

[5] This group includes the documents at privilege log entries 35, 142, 304, 329, 428, 431, 432, 435, 439, 549, 550, 552, 1097, 1185, 1190, 438, 551, 571, 1184, 1187, 1189, 1191, 1193, 1211, 1279, and 1655.

[6] This includes documents at privilege log entries 150, 152, 327, 151, 328, 1701, 1704, 59, 1684, 1686, 379, 380, 381, 382, 556, and 1682.

Phoenix employee named Robert Young to Geruson, Stein, Lopez, and Austin. The email text simply says "Attorney client privilege." The attachment to the email, which is also marked "Attorney Client Privilege," consists of a one-page financial analysis that appears related to VMware.[7] As with the other documents in this group, the email is not copied to an attorney and there is no indication that the financial analysis was prepared by or at the direction of an attorney.

The third and final group involves a February 6, 2015 email from Geruson in which he forwarded to Lopez an email from David Macey of Marlin Equity. (Entry 585.) Macey's email contains his analysis of the Master License Agreement between Phoenix and VMware and the various amendments associated with it. Like the emails in the second group discussed above, the emails were not copied to any attorneys. Macey's email, which Geruson forwarded to Lopez without comment, contains no indication that he prepared his analysis or sent the email at the direction of an attorney. It does not reference litigation with VMware.[8]

### C. Whether the Documents at Issue Served a "Dual Purpose," and If So, Whether They Constitute Work Product Under the "Because Of" Test

VMware has presented facts supporting its position that the documents at issue in this dispute served a business purpose. Specifically, VMware presented evidence that Phoenix internally referred to its dispute with VMware as a "collections" matter. *See* Suppl. Gonzalez Decl. Exs. Q (email asking for "status on VMware collections?"), O and P (presentations referencing VMware as part of "Collections" processes). According to CFO Stein, the CTF successfully had reached business resolutions with every other Phoenix customer targeted for

---

[7] While it should go without saying, simply labeling a document as privileged does not make it so.

[8] Phoenix also submitted for in camera review six documents at privilege log entries 42, 576, 578, 581, 584, and 1199. These documents appear to be versions of the same document entitled "VMware—Phoenix Pre-Meeting Questions and Information," and all are marked "attorney-client privileged." Phoenix listed each of these documents on its log as withheld based on attorney-client privilege and work product. However, the court ordered Phoenix to submit for review only those documents withheld "solely on the basis of work product doctrine." *See* Minute Order. To the extent Phoenix has withdrawn its claim of attorney-client privilege and is only asserting work product protection as to these six documents, the court is unable to assess the applicability of the doctrine. This is because each document is listed on the privilege log as an attachment to another entry, but Phoenix did not submit the emails or communications to which the documents were attached. Therefore, if Phoenix now asserts only the work product doctrine as to the six documents, it shall lodge for in camera review each of the documents to which they were attached **within two business days of the date of this order.**

11

collections. Stein Dep. at 110. Further, in early February 2015, Stein provided an update to Marlin Equity and Phoenix CEO Geruson on the dispute. He described the data that Phoenix had requested from VMware and concluded, "[s]ame process as with [Customer A]," which is a customer from which the Phoenix CTF had negotiated additional royalty payments of several million dollars. Gonzalez Decl. at Ex. J. Therefore, regardless of whether VMware initially was "identified as part of the work" of the CTF, *see* Lopez Decl. ¶ 18, the evidence strongly suggests that Phoenix's dispute with VMware eventually was treated as being on a similar track as other CTF matters. All of this indicates that the documents had a business purpose: they were prepared for business negotiations with VMWare, which would be conducted using the same process Phoenix had employed with numerous other customers.

Phoenix points to the fact that its in-house counsel provided "continual" legal advice and direction regarding the VMWare dispute from November 14, 2014 onward. However, the involvement of counsel does not automatically denote that a document is entitled to protection. "In-house counsel may act as integral players in a company's business decisions or activities, as well as its legal matters." *See Oracle Am., Inc. v. Google, Inc.*, No. C 10-03561-WHA (DMR), 2011 WL 3794892, at *4 (N.D. Cal. Aug. 26, 2011) (holding that including in-house counsel on a communication does not automatically confer privilege); *Visa USA, Inc.*, 2004 WL 1878209, *7 ("[T]he fact that documents were reviewed and subject to revisions by counsel does not necessarily make them privileged or protected by the work product doctrine."). However, Segal's involvement, coupled with the fact that Phoenix's dispute with VMWare blossomed into a lawsuit within a short period of time following the date of the disputed documents, supports an inference that the documents served both a litigation and non-litigation purpose. Therefore, in order to decide whether these dual purpose documents are entitled to work product protection, the court must determine whether, under the totality of the circumstances, "it can fairly be said that the document[s] were created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *In re Grand Jury Subpoena*, 357 F.3d at 908 (quotation omitted).

Based on careful review of the documents, the court concludes that Phoenix has not met its

burden to demonstrate that the work product doctrine applies to these documents. As discussed above, VMware submitted significant evidence suggesting that Phoenix's licensing dispute with VMware was treated internally as a CTF matter, to be handled as a business negotiation. For purposes of this analysis, it does not matter whether Phoenix's dispute with VMware originally arose as a CTF matter, or was discovered through other means; the evidence supports that Phoenix followed the same basic playbook with VMware that the CTF had used with respect to its negotiations with Customer A and other CTF targets. This would involve fact gathering and analyses of VMware's use of Phoenix's BIOS and potential amounts owed to Phoenix. The documents submitted for in camera review reflect exactly that. They consist of communications between Phoenix employees and CTF members gathering information and analyzing the licensing dispute with VMware.

Unlike the consultant's investigatory documents at issue in *In re Grand Jury Subpoena*, all of which were "animated" by the threat of litigation, 357 F.3d at 908, Phoenix's documents served an independent business purpose. They are therefore similar to the documents at issue in *United States v. Frederick*, 182 F.3d 496, 501-02 (7th Cir. 1999), a case discussed by the Ninth Circuit in *In re Grand Jury Subpoena*. In *Frederick*, the documents at issue "were accountants' worksheets, albeit prepared by a lawyer, in preparation of his clients' tax returns," where the clients were under investigation. *In re Grand Jury Subpoena*, 357 F.3d at 909. The Seventh Circuit concluded that "work product preparation was ultimately inappropriate because tax return preparation is a readily separable purpose from litigation preparation and 'using a lawyer in lieu of another form of tax preparer' does nothing to blur that distinction." *Id*. (quoting *Frederick*, 182 F.3d at 501). Here, Phoenix's analysis of a customer's license agreement in order to determine whether it owes additional royalties had a "readily separable purpose." *See, e.g., Visa U.S.A., Inc.*, 2004 WL 1878209, at *8 (drafts of analysis that were "prepared to assist [plaintiff] in reaching a business decision" served "an independent business purpose" and were thus not protected work product).

Moreover, despite Segal's representations about the extent of her involvement in the dispute, and Lopez's statement that she coordinated internal communications about VMware at Segal's direction and with her guidance, none of the communications appear to involve any

13

1 attorneys. It is notable that Segal's declaration does not identify a single document for which she
2 provided instruction, review, or comment. Lack of attorney involvement in documents "is a useful
3 sign, in conjunction with other indicators, that they are not protected work product." *See Largan*,
4 2015 WL 124557, at *4. None of the documents reference or discuss legal advice or direction
5 from an attorney, or reference impending litigation with VMware.

6 Notwithstanding the strongly worded response in early December 2014 from VMware's
7 counsel, as of February 2, 2015, Phoenix was still internally referring to the dispute as employing
8 the "same process" as that used in negotiating with a major CTF target. Only one day before the
9 commencement of the seven-day span covering the disputed documents, Phoenix's Vice President
10 of Sales communicated with VMware, seeking data and noting that VMware legal had agreed to
11 "move forward on resolving this licensing situation amicably." Of note, Phoenix did not issue a
12 litigation hold notice until February 17, 2015. *See Apple Inc. v. Samsung Elecs. Co., Ltd*., 881 F.
13 Supp. 2d 1132, 1136-37 (N.D. Cal. 2012) ("[t]he common law imposes the obligation to preserve
14 evidence from the moment that litigation is reasonably anticipated. . . . when a company or
15 organization has a document retention policy, it is obligated to suspend that policy and implement
16 a litigation hold to ensure the preservation of relevant documents after the preservation duty has
17 been triggered." (citations omitted)). This tends to support that Phoenix did not reasonably
18 anticipate that this matter would result in a lawsuit until *after* the date of the disputed documents.

19 Every royalty liability negotiation has the potential of resulting in a lawsuit. Some, like
20 this one, actually end up in court. But many do not. For this reason, not all documents prepared
21 for a royalty negotiation should be swept wholesale under the work product umbrella if litigation
22 later ensues. Upon careful review, it appears that the documents at issue would have been drafted
23 or circulated for a business purpose even if this lawsuit never came to pass. Therefore, "it simply
24 cannot be fairly said that [the documents] were created in the first place because of the need to
25 obtain legal advice or because of anticipation of litigation." *See Visa U.S.A., Inc.*, 2004 WL
26 1878209, at *8. Instead, Phoenix's employees would have undertaken these analyses and related
27 communications even if Phoenix had not anticipated litigation with VMware. The court concludes
28 that Phoenix has not met its burden of establishing that the documents "would not have been

created in substantially similar form but for the prospect of the litigation." *In re Grand Jury Subpoena*, 357 F.3d at 908. Accordingly, the court finds that the documents described above are not protected by the work product doctrine.

Finally, the document at privilege log entry 1715 is listed on the log as an attachment to an email from Jocelyn Enecial. The document is a Phoenix Board Meeting Power Point presentation dated September 10, 2014, and Phoenix redacted four pages of the 32-page presentation. Phoenix's privilege log describes the document as "Presentation containing confidential legal advice, prepared in anticipation of litigation, regarding dispute with third party." The four redacted pages discuss Phoenix's litigation with what appears to be an unrelated third party. It makes no mention of Phoenix's dispute with VMware or any of the licensing or collections matters at issue in this litigation. Since the document is irrelevant to this litigation, VMware's motion to compel production of this document is denied.

## IV.  CONCLUSION

VMware's motion to compel in camera review and production is granted in part. With the exception of the documents at privilege log entries 42, 576, 578, 581, 584, 1199, and 1715, Phoenix shall produce all of the documents it submitted for in camera review within seven days of the date of this order. *See supra* n.8.

**IT IS SO ORDERED.**

Dated: July 1, 2016



Donna M. Ryu
United States Magistrate Judge