1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    PHOENIX TECHNOLOGIES LTD.,              Case No. 15-cv-01414-HSG

              Plaintiff,
8                                            **ORDER DENYING PLAINTIFF'S**
         v.                                  **MOTION FOR SUMMARY JUDGMENT**
9                                            **AND GRANTING IN PART, DENYING**
                                             **IN PART DEFENDANT'S CROSS**
10   VMWARE, INC.,                           **MOTION FOR SUMMARY**
                                             **JUDGMENT; SETTING TELEPHONIC**
              Defendant.
11                                           **CASE MANAGEMENT CONFERENCE**

12                                           Re: Dkt. Nos. 121, 129

13        Before the Court are Plaintiff Phoenix Technologies, LTD. ("Plaintiff" or "Phoenix") and

14   Defendant VMware, Inc.'s ("Defendant" or "VMware") cross-motions for summary judgment.

15   *See* Dkt. Nos. 121 (Plaintiff's Motion, hereinafter "Mot."), 214 (Defendant's Motion, hereinafter

16   "Cross Mot."). The Court **DENIES** Plaintiff's Motion for summary judgment and **GRANTS** in

17   part and **DENIES** in part Defendant's cross motion for summary judgment.

18   I.   **FACTUAL BACKGROUND**

19        A.   **Procedural History**

20        Plaintiff filed this action on March 27, 2015. *See* Dkt. No. 1 ("Compl."). Plaintiff filed a

21   motion for summary judgment on July 22, 2016. *See* Mot. Defendant filed a cross-motion for

22   summary judgment on July 23, 2016. *See* Cross Mot. Both parties filed oppositions and replies.

23   *See* Dkt Nos. 216 (Defendant's opposition to the Mot., hereinafter "Opp."), 149 (Plaintiff's

24   opposition to the Cross Mot., hereinafter "Cross Opp."), 158 (Plaintiff's reply to the Mot.,

25   hereinafter "Reply"), 219 (Defendant's reply to the Cross Mot., hereinafter "Cross Reply").

26        B.   **The Parties and Products**

27        Plaintiff is a corporation organized under the laws of the State of Delaware, with its

28   principal place of business in California. *See* Compl. ¶ 12. Phoenix develops computer software,

United States District Court
Northern District of California

1    including its Basic Input/Output System ("BIOS") programs. *Id.* BIOS "is a built-in program

2    (firmware) in a computer that facilitates the initial booting up process of the computer" by

3    enabling "the computer's microprocessor to start the computer's operating system." *Id.* ¶ 19.

4    BIOS also "manages the data flow between the computer's operating system and attached

5    devices," such as the keyboard, mouse, and hard disks. *Id.* Phoenix licenses its BIOS programs to

6    other companies, which can then embed the program into their products. *Id.* ¶ 22. Phoenix

7    licenses its BIOS programs in two main ways: (1) by licensing its "object code," which refers to

8    code that cannot be modified; and (2) by licensing its "source code," which refers to code that can

9    be "reviewed and modified by a software engineer." *Id.* ¶ 23.

10            Defendant is also a corporation organized under the laws of the State of Delaware, with its

11   principal place of business in California. *See id.* ¶ 13. Among other products, VMware develops

12   "virtualization software," which is used to create "simulated computing environment[s]." *Id.* ¶ 24.

13   These may be referred to as "guest machines." This software allows an individual to create

14   multiple guest machines on a single physical computer, each of which may contain an operating

15   system that is different from that of the host computer. *Id.* These may be referred to as "guest

16   operating systems." Each guest machine must use a BIOS program to load its individual operating

17   system and facilitate its boot up process. *Id.* ¶ 25.

18            VMware has two types of virtualization software that create guest machines: hosted

19   hypervisors and bare metal hypervisors. *Id.* ¶ 47. Hosted hypervisors are "installed on a host

20   computer's host operating system." Opp. ¶ 6; Compl. ¶ 47. Defendant contends that VMware's

21   Workstation and GSX are both hosted hypervisors. Opp. ¶ 6. In contrast, bare metal hypervisors

22   are "installed directly on the physical hardware of the host computer." Opp. ¶ 7; *see also* Compl.

23   ¶ 47. "Rather than being installed on top of a preinstalled host operating system," VMware's bare

24   metal hypervisors have an operating system embedded within them called "vmkernal," which

25   "communicates with and manages the physical hardware of the host computer. Opp. ¶ 7; *see also*

26   Compl. ¶ 47(c). Defendant contends that ESX and ESXi are both bare metal hypervisors. Opp.

27   ¶ 7. Defendant also contends that the only difference between ESX and ESXi is that ESX contains

28   a "console operating system" that "helps boot vmkernal before turning over control of the physical

2

1    hardware to vmkernal," while VMware removed that operating system from ESXi. Opp. ¶ 8.[1]

2    **C.    Original MLA**

3        On March 31, 1998, the parties entered into a master license agreement ("MLA") under

4    which VMware obtained a license to use Phoenix's "PhoenixPICO BIOS for Intel Pentium

5    Processors for the Intel 82430MX/HX chipset" program. *See* Dkt. No. 120 Ex. 15 (1998 MLA).

6    The MLA limited VMware's use of the product to incorporating the BIOS program in defined

7    "Licensee's Products." *See id.* § 1.5. Specifically, the MLA "granted VMware an object code

8    license to distribute copies of the BIOS 'in object code form solely for use with and[/]or

9    incorporat[ion] into Licensee's Product[s],'" and a source code license that allowed VMware to

10   modify the BIOS program for distribution "only in Licensee's Products." *See id.* §§ 2.1, 2.5. The

11   MLA defined Licensee's Products as VMware's software that "incorporates and uses [the product]

12   and that runs on standard PC platforms with a standard PC operating system." *Id.* § 1.5. At the

13   time the parties entered into the MLA, VMware's ESX and ESXi products had not yet been

14   developed. Compl. ¶ 46; Dkt. No. 26 ("Answer") ¶ 46. VMware launched ESX in 2001. *Id.*

15   **D.    MLA Amendments**

16       The parties amended the original MLA several times between 2000 and 2004. *See* Dkt. No

17   127 Exs. 8-13. Each amendment incorporated by reference the express conditions set forth in the

18   original MLA, including the restriction limiting VMware's use of the product to "Licensee's

19   Products." *Id.*; Mot. at 6:9-6:12,6:20-6:26. In 2005, an internal audit at VMware revealed that the

20   company was not in compliance with the original MLA, because it was using Phoenix's 440BX

21   BIOS program while the original MLA only provided for VMware's use of Phoenix's 430MX

22   BIOS program. Dkt. No. 215 Ex. 38 at PHX00000610. VMware contacted Phoenix to amend the

23   MLA so as to include the 440BX BIOS. *Id.* On September 30, 2005, the parties entered into a

24   final amendment for a "fully paid-up" perpetual license, under which VMware was required to

25   make a one-time lump sum payment to Phoenix for all past and future shipments of the 440BX

---

[1] While Plaintiff's complaint argued that Defendant's GSX, Workstation, ESX, and ESXi products all breached the parties' MLA, Plaintiff has "narrowed its claims to products containing ESXi technology" following discovery. *See* Cross Opp. at 1.

*(left margin)* United States District Court   Northern District of California

1   BIOS program.  Dkt. No. 128 Ex. 41 (2005 MLA amendment).  The amended MLA granted

2   VMware the right to distribute "unlimited copies" of the 440BX BIOS "solely for use with and

3   incorporation into Licensee's Products," and granted the license "subject to all terms, conditions,

4   requirements, restrictions, and limitations set forth in [the] Amendment," notwithstanding

5   anything to the contrary "in the MLA." *Id.* ¶¶ 1.1; 1.2.  In addition, the amendment stated that "all

6   rights not expressly granted [were] reserved by Phoenix." *Id.*  Three years later, in 2008, VMware

7   launched ESXi.  *See* Dkt. No. 211 Ex. 26 at 2:25.

8   **II.   SUMMARY JUDGMENT LEGAL STANDARD**

9     Summary judgment is proper where the pleadings and evidence demonstrate "there is no

10  genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of

11  law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material

12  issue of fact is a question a trier of fact must answer to determine the rights of the parties under the

13  applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute

14  is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

15  party." *Id.*

16    The moving party bears "the initial responsibility of informing the district court of the

17  basis for its motion." *Celotex*, 477 U.S. at 323.  To satisfy this burden, the moving party must

18  demonstrate that no genuine issue of material fact exists for trial.  *Id.* at 322.  To survive a motion

19  for summary judgment, the non-moving party must then show that there are genuine factual issues

20  that can only be resolved by the trier of fact.  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736,

21  738 (9th Cir. 2000).  To do so, the non-moving party must present specific facts creating a genuine

22  issue of material fact. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.

23    The court must review the record as a whole and draw all reasonable inferences in favor of

24  the non-moving party.  *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

25  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn

26  from the undisputed facts."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119,

27  1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers &*

28  *Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th

United States District Court
Northern District of California

1 │ Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should

2 │ be drawn from them, summary judgment is improper.").

3 │ **III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT**

4 │       The parties' cross-motions raise two fundamental issues: (1) whether Defendant's use of

5 │ Phoenix's BIOS program in its ESXi software breached the terms of the MLA and infringed

6 │ Phoenix's copyright; and (2) whether Defendant has any colorable affirmative defenses.  Given

7 │ the overlapping nature of the parties' arguments, the Court will address their motions

8 │ simultaneously.  *See Public Storage v. Sprint Corp.*, No. CV 14–2594–GW (PLAx), 2015 WL

9 │ 1057923, at *5 (C.D. Cal. March 9, 2015).

10 │     **A.   Interpretation of the MLA**

11 │         **i.   Contract Interpretation Legal Standard**

12 │       Under California law, a contract "must be so interpreted as to give effect to the mutual

13 │ intention of the parties as it existed at the time of contracting, so far as the same is ascertainable

14 │ and lawful."  Cal. Civ. Code § 1636.  "Where contract language is clear and explicit and does not

15 │ lead to absurd results, we ascertain intent from the written terms and go no further."  *Ticor Title*

16 │ *Ins. Co. v. Employer's Ins. of Wausau*, 40 Cal. App. 4th 1699, 1707 (1995).  However, when the

17 │ meaning of contractual language is disputed, the Court must "provisionally receive[] (without

18 │ actually admitting) all credible evidence concerning the parties' intentions" to determine if the

19 │ language is ambiguous, i.e., "reasonably susceptible" to the interpretation urged by either party.

20 │ *See Winet v. Price*, 4 Cal. App. 4th 1159, 1165 (1992).  "Such evidence includes testimony as to

21 │ the 'circumstances surrounding the making of the agreement . . . including the object, nature and

22 │ subject matter of the writing . . .' so that the court can 'place itself in the same situation in which

23 │ the parties found themselves at the time of contracting.'"  *PG&E Co. v. G. W. Thomas Drayage &*

24 │ *Rigging Co., Inc.*, 69 Cal. 2d 33, 40 (1968) (quoting *Universal Sales Corp. v. California Press*

25 │ *Mfg. Co.*, 20 Cal. 2d 751, 761 (1942)).  "The conduct of the parties after execution of the contract

26 │ and before any controversy has arisen as to its effect affords the most reliable evidence of the

27 │ parties' intentions."  *See Kennecott v. Union Oil*, 196 Cal. App. 3d 1179, 189-90 (1987).  "If in

28 │ light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the

United States District Court
Northern District of California

1    interpretation urged [by either party], the extrinsic evidence is then admitted to aid in the second

2    step—interpreting the contract." *Id.* "When there is no material conflict in the extrinsic evidence,

3    or where the contractual language is unambiguous, the court interprets the contract as a matter of

4    law." *Public Storage*, 2015 WL 1057923, at *6; *see also* Cal. Civ. Code § 1638; *City of Hope*

5    *Nat. Med. Ctr. v. Genentech, Inc.,* 43 Cal. 4th 375, 395 (2008). "However, if the interpretation

6    turns upon the credibility of conflicting extrinsic evidence, or if 'construing the evidence in the

7    nonmovant's favor, the ambiguity can be resolved consistent with the nonmovant's position,'

8    summary judgment is inappropriate." *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 990

9    (9th Cir. 2006).

10                    **ii.    "Licensee's Products" Disputed Terms**

11           As discussed above, the 1998 MLA limited VMware's use of Phoenix's BIOS program to

12   its software products that fell within the scope of the "Licensee's Products" definition. *See* Dkt.

13   No. 120 Ex. 15 § 1.5. The MLA defined "Licensee's Products" as VMware's "software that

14   incorporates and uses the [BIOS program] and that runs on standard PC platforms with a standard

15   PC operating system." *Id.* The parties agree that the 2005 MLA amendment did not alter that

16   definition, and now assert that the contractual language is unambiguous, though they advance

17   conflicting interpretations that are favorable to their respective positions. *See* Mot. Exs. 24 at 3:7-

18   3:8, 25 at 3:3-3:6. Specifically, Plaintiff alleges that Defendant's use of the BIOS program in the

19   ESXi product violated two portions of the "Licensee's Products" limitation: (1) the term "standard

20   PC platforms"; and (2) the phrase "with standard a PC operating system."

21                         1.   "Standard PC platforms"

22           Plaintiff first argues that VMware's ESXi product is not a "standard PC platform" under

23   the "Licensee's Products" definition, because ESXi "is designed to run on servers instead of

24   'standard PC platforms.'" *See* Compl. ¶ 68(a). In contrast, Defendant argues that "[t]here can be

25   no genuine dispute that the phrase 'standard PC platforms' includes servers," because "the term

26   'standard PC platforms' refers to an operating environment for software based on the x86

27   architecture that is descended from the IBM PC line of computers," and on which the ESXi

28   product runs. Cross Mot. at 17:24-17:25, 18:3-18:7. In response, Plaintiff concedes only that

United States District Court
Northern District of California

6

1   determination of this issue would "turn[] on multiple factual disputes that cannot be resolved as a

2   matter of law." *See* Cross Opp. at 10:5-10:6.

3                    2.   "With a standard PC operating system"

4          Plaintiff also argues that the word "with" in the "Licensee's Products" definition is

5   synonymous with the word "containing" such that the computer's standard PC platform must be

6   *equipped with* a standard PC operating system. *See* Mot. at 14:22-15:6, 16:5-16:7.  Plaintiff

7   argues that Defendant's ESXi software is not a "Licensee's Product" because the host PC platform

8   on which it runs does not contain a standard PC operating system. *Id.*

9          Defendant contends that the term "with" does not impose a requirement that the PC

10   platform *contain* a standard PC operating system at the host level. *See* Cross Mot. at 21:3-21:7;

11   Opp. at 14:4-14:9.  Instead, Defendant argues that the word "with" modifies the word "runs"

12   rather than the phrase "standard PC platforms," and that the plain meaning of the "Licensee's

13   Products" definition therefore requires only that the BIOS program run on a standard PC platform

14   *at the same time as* or *alongside* a standard PC operating system that is running on the host

15   computer, hypervisor software (i.e., vmkernal), or guest machines created by its software (i.e.,

16   Windows or Linux). *See* Cross Mot. at 21:3-21:7, 22:4-22:7 & 22 n.13; Opp. at 14:4-14:9.

17   Defendant argues that its ESXi product meets the requirements of the definition, "because [ESXi

18   is] always running *with* an x86-compatible operating system [running] at the 'guest' or

19   'hypervisor' level."  Cross Mot. at 20:22-20:23 (emphasis in original).

20             iii.   **The Parties' Claims Raise Genuine Issues of Material Fact as to Both**
               **Disputed Terms**
21

22          Because the parties dispute both the meaning of the term "standard PC platforms" and the

23   qualifying phrase "with a standard PC operating system," the Court's first step must be to

24   "provisionally consider the extrinsic evidence" in order to determine whether the contract

25   language is reasonably susceptible to the contrary interpretations advanced by the parties. *Young*

26   *v. Wideawake Entertainment LLC*, No. CV 10-1019 CAS (JEMx), 2011 U.S. Dist. LEXIS 158553,

27   at *13 (C.D. Cal. Apr. 19, 2011).  The Court finds that in both instances it is, given the parties'

28   alleged understandings at the time of the 1998 MLA and the 2005 MLA amendment, and their

United States District Court
Northern District of California

1    post-agreement course of conduct.

2         First, the parties offer extrinsic evidence of their respective understandings of the original

3    "Licensee's Products" definition as set out in the 1998 MLA that could support each of their

4    positions if construed in their favor.  Plaintiff argues that the parties understood the definition to

5    incorporate Phoenix's BIOS only in VMware's desktop products that ran on standard PC

6    platforms containing a standard PC operating system at the host level.  *See* Mot. at 16:28-17:22;

7    Cross Opp. at 10:6-10:8; Dkt. No. 148 Ex. 74 at VMWARE-PHX00073949 (VMware lead

8    negotiator Tom Jurewicz stating that in 1998 his team "negotiated $0.75 per license for a *desktop*

9    *product*"); Dkt. No. 123 Ex. 20 at VMWARE-PHX00000157 (VMware internal purchase order

10   stating that a 2000 MLA amendment was required "[f]or added functionality in the desktop

11   products").  In support, Plaintiff points to evidence that at the time the parties entered into the

12   original contract, "VMware was developing its first virtualization software" that did not include

13   bare metal products.  Mot. at 17:11-17:12.  Instead, its products "initially [came] in two flavors,

14   depending on the user's host operating system: VMware for Linux and VMware for Windows

15   NT."  *Id.*; Dkt. No. 122 Ex. 58 at VMWARE-PHX00107993.  Plaintiff argues that the parties

16   thereafter "expressly retained and incorporated by reference (without change)" the original

17   "Licensee's Products" definition in later amendments of the contract, such that there was a

18   "common understanding that the 'Licensee's Products' restrictions continued to be understood as

19   they had been when the parties originally negotiated them in 1998"--namely, that the BIOS was to

20   be used in VMware's products designed for use on desktop computers that were equipped with

21   Linux or Windows operating systems running at the host level.  Mot. at 18:12-18:17.

22        Defendant responds that VMware's references to "desktop products" merely demonstrate

23   that those were "the only product[s] VMware had in 1998, and that the parties' course of conduct

24   following the execution of the 1998 agreement reflects the parties' common understanding that

25   VMware's bare metal products--including ESXi--satisfied the original "Licensee's Products"

26   definition.  *See* Opp. at 7:2-7:14, 16:27-17:17; Cross Reply at 8:18-8:20.  In support of this

27   argument, Defendant points to the deposition testimony of Steve Herrod, a VMware employee

28   who managed its "Virtual Machine Monitor" team beginning in 2001.  *See* Dkt. No. 131 Ex. 15 at

United States District Court
Northern District of California

8

8:1-11. In his deposition, Herrod stated that he had several conversations with Phoenix engineers regarding VMware's intention to develop bare metal products around 2001, 2003, and 2005. *See id.* at 100:3-20, 101:1-15, 106:16-107:11, 117:6-7, 123:1-124:25. Herrod stated that during those conversations, he informed Phoenix employees that the bare metal products would be designed to run on "laptops or desktops or servers," and that Phoenix employees later provided his team with source code modules to allow them to continue to develop their bare metal products after checking with Phoenix's legal and business departments. *See id.* at 101:1-102:17, 104:8-12; Dkt. No. 131 Ex. 16 at 169:3-9 (Phoenix engineer Jonathan White stating that "[u]nder Phoenix's general process . . . there's a legal check that's done to make sure that the customer's entitled . . . to that code."). Consistent with these assertions, Defendant submits a series of emails between Phoenix employee Jeff Underhill and a VMware employee stating that Underhill would send over the requested source code enhancement after checking with Phoenix employee Julie Wilson to ensure that doing so would not "change[] the licensing . . . on the contract side of things." *See* Dkt. No. 131 Ex. 19 at VMWARE-PHX00080081. The source code was released to Phoenix twelve days later, which, Defendant argues, suggests that Phoenix had impliedly agreed that VMware's new products would not violate any portion of the "Licensee's Products" definition. *See* Dkt. No. 131 Ex. 20 at VMWARE-PHX00080093.

In response, Plaintiff contends that the source code Plaintiff sent to Defendant was never intended for use in Defendant's server products, despite its ability to support such use. *See* Cross Opp. at 11:12-11:22. Plaintiff also argues that the majority of VMware's proffered evidence is irrelevant because it relates to VMware's GSX and ESX products rather than the ESXi product developed in 2008, which created "a distinct infringing aspect" by discarding the console operating system that had previously been present in ESX. *See* Cross Opp. at 1:10-1:15,10:11-10:16. Plaintiff argues that VMware's use of the Phoenix BIOS in a product lacking an operating system at the host level thus "could not have been contemplated during the parties' [prior] negotiations" such that ESXi comported with the original "Licensee's Products" definition. *Id.* at 14:6-14:14.

The parties also offer extrinsic evidence that gives rise to conflicting inferences regarding

1    Phoenix and VMware's lead negotiators' understandings of the 2005 MLA amendment.  For

2    example, Jurewicz stated that he never made any attempt to hide VMware's use of servers from

3    Phoenix's lead negotiator Carol Hallett, and that it was his understanding that the 2005

4    amendment enabled VMware to use the Phoenix BIOS in its server products, including ESX.  *See*

5    Dkt. No. 128 Ex. 18 at 42:7-21, 45:7-13.  However, Jurewicz admitted that he had "never

6    reviewed . . . [the] 'Licensee's Products' definition" prior to his involvement in the present action,

7    including during the 2005 MLA amendment negotiations, or prior to any previous amendments in

8    which he served as a VMware negotiator.  *See* Dkt. No. 148 Ex. 75 at 66:9-67:3, 78:12-24.   In

9    addition, while Hallett's deposition testimony suggests that she may have understood the 2005

10   amendment to encompass VMware's server products, considering the record as a whole and

11   making all inferences in the non-moving party's favor, the Court cannot conclude as a matter of

12   law at this stage that the course of dealing evidence compels summary judgment for VMware.

13   *Compare* Dkt. No. 128 Ex. 39 at 28:22-29:2, 62:25-63:14 (Hallett stating that it was "absolutely"

14   her understanding that the 2005 amendment would enable VMware "to use [Phoenix's] BIOS for

15   whatever they want[ed].") *with id.* at 68:17-70:16 (Hallett later testifying that the amended MLA

16   would have only enabled VMware to use the BIOS in its 430 and 440 chipsets, and indicating that

17   she did not know whether those chipsets were in VMware's "flagship product").

18        The extrinsic evidence cited by the parties to support many of their arguments evinces a

19   years-long course of conduct that at times could be read to support each party's purported

20   interpretation of the "Licensee's Products" definition.  The Court therefore concludes that the

21   "Licensee's Products" definition is ambiguous both as to whether "standard PC platforms"

22   encompasses servers, and as to whether those platforms must *contain* or merely *run alongside* a

23   standard PC operating system that is running at the host, hypervisor, or guest level.  *See WYDA*

24   *Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1719 (1996) (holding that based on the parties' course

25   of conduct, an option was "ambiguous as to when the parties intended the financing period to

26   begin.").  While the extrinsic evidence does not involve a simple, direct conflict, when that

27   evidence is construed in each party's favor as required on cross-motions for summary judgment,

28   the Court finds that conflicting inferences arise that could resolve the ambiguity in either party's

1   favor.  Summary judgment is therefore inappropriate.  *See Miller*, 454 F.3d at 990.

2          iv.    **"Multiple Processor" Limitation**

3         Defendant also requests partial summary judgment "that VMware's use of the BIOS

4   software is limited only by 'the Licensee's Products' limitation, and not the additional limitations

5   [set forth] in the [original] MLA or 2000 Amendment."  *See Cross Mot.* at 24 n.17. ▮▮▮▮

6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8   *See* Dkt. No. 127 Ex. 9. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Dkt.

12  No. 128 Ex. 41. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

17        Defendant argues that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮  Cross Mot. at 23:23-24:2.  However, this argument fails.  Because the 2005 amendment

22  does not ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮  *See* Dkt. No 128 Ex. 41 § 3.  This conclusion is supported by ▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮  *Id.* § 1.2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See id.* at PHX00000029.  Because the 2005

28  amendment stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   ████████ the 2005 amendment does not extinguish the parties' previously set limitations, as

2   Defendant suggests. *See id.* § 1.1. The Court therefore **DENIES** Defendant's request for partial

3   summary judgment.

4   **B. Affirmative Defenses**

5   Defendant also raises five affirmative defenses, *see* Cross Mot. at 24:20-28:21, each of

6   which Phoenix opposes, *see* Reply 15:6-15:21; Cross Opp. 20:13-28:18. The Court will address

7   each in turn.

8   **i. Statute of Limitations: Breach of Contract**

9   In California, written contracts are governed by a four-year statute of limitations, which

10   "ordinarily accrues at the time of breach even though the injured party is unaware of his right to

11   sue." *Donahue v. United Artists Corp.*, 2 Cal. App. 3d 794, 802 n.2 (1969); Cal. Civ. Proc. Code

12   § 337. Defendant contends that Plaintiff's contract claims began to accrue when VMware first

13   incorporated the Phoenix BIOS program into its server products (i.e., its ESX products) prior to

14   the enactment of the 2005 amendment, and that Plaintiff's contract claims are therefore time

15   barred in their entirety. *See* Cross Mot. at 26:8-26:11. The Court agrees.

16   Even assuming, as Plaintiff asserts, that the ESXi product breached the MLA agreement in

17   a different way than Defendant's ESX product, *see* Cross Opp. at 20:13-20:21, the first of any

18   alleged breaches by ESXi would have occurred when it was launched in 2008, *see* Dkt. No. 211

19   Ex. 26 at 2:25. Because Plaintiff's knowledge of the initial breach is irrelevant, and because

20   Plaintiff did not file the present action until March 27, 2015, Plaintiff's contract claims are time

21   barred under the applicable statute of limitations period.

22   Neither the "continuous accrual theory" nor the "discovery rule" can save Plaintiff's time

23   barred claims. First, the California Court of Appeal has held that the continuous accrual theory

24   applies only in situations "where performance of contractual obligations is severed into intervals,

25   as in installment contracts . . . [and in] such diverse contractual arrangements as leases with

26   periodic rental payments . . . and contracts calling for periodic, pension-like payments on an

27   obligation with no fixed and final amount." *Armstrong Petroleum Corp. v. Tri-Valley Oil and Gas*

28   *Co.*, 116 Cal. App. 4th 1375, 1388 (2004). In those situations, "breach of contract actions accrue[]

*United States District Court*
*Northern District of California*

12

1    periodically when defective performance [is] given." *See id.* at 1396. "If the parties to [a

2    contract's] making intend an entire contract, not a severable one, the courts will not find it

3    divisible despite periodic performance." *Id.* Here, the 2005 amendment was a fully paid-up

4    perpetual license for unlimited use of Phoenix's BIOS program beginning September 17, 2005.

5    *See* Dkt. No. 128 Ex. 41. The amendment is therefore clearly not severable, and the continuous

6    accrual theory cannot apply. *See e.g. D.C. Comics v. Pacific Pictures Corp.*, 938 F. Supp. 941,

7    951 (C.D. Cal. April 4, 2013) (holding that "a purported one-time transfer of [Defendant's] rights

8    to [Plaintiff] . . . did not create a continuing obligation.").

9          The discovery rule also does not change the Court's analysis. The discovery rule

10   "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the

11   cause of action," *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005), in cases where it

12   would be "manifestly unjust to deprive plaintiffs of a cause of action before they are aware that

13   they have been injured," *Leaf v. City of San Mateo*, 104 Cal. App. 3d 398, 406 (1980). Generally,

14   such circumstances would arise only where: "(1) the injury, the act causing the injury, or both,

15   were difficult for the plaintiff to detect; (2) the defendant in most instances was in a far superior

16   position to comprehend the act and the injury; and (3) the defendant in many instances had reason

17   to believe that the plaintiff remained ignorant that he was wronged." *Wakefield v. Wells Fargo &*

18   *Co.*, No. C 13-05053 LB, 2014 U.S. Dist. LEXIS 144142, at *32-33 (N.D. Cal. Oct. 9, 2014).

19   Courts have thus applied this rule in cases involving latent defects in real property, professional

20   malpractice, or the breach of a fiduciary relationship. *See Leaf*, 104 Cal. App. 3d at 407-08.

21   However, the California Supreme Court has not yet "considered how and when the discovery rule

22   delays the accrual of a breach of contract claim (or if it even does)," *Wakefield*, 2014 U.S. Dist.

23   LEXIS 144142, at *31. The California Court of Appeal has therefore "extended the discovery rule

24   rarely, and only in narrow circumstances, to breach of contract claims." *Id.* "Traditionally . . . the

25   discovery rule ha[s] not been held applicable to breach of contract actions except in cases

26   involving fraud or misrepresentation," neither of which is at issue here. *Id.* Because Plaintiff has

27   demonstrated no reason why it would be manifestly unjust for its contract claims to accrue at the

28   time the breach occurred, the discovery rule cannot apply.

United States District Court
Northern District of California

13

1    The Court therefore finds that Plaintiff's breach of contract claims are time-barred.

2          **ii.    Statute of Limitations: Copyright Infringement**

3          The Copyright Act provides that "[n]o civil action shall be maintained under the [Act]

4    unless it is commenced within three years after the claim accrued." *Petrella v. Metro-Goldwyn-*

5    *Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014) (quoting 17 U.S.C § 507(b)). A copyright claim begins

6    to accrue when "the plaintiff learned or by reasonable diligence could have learned that he had a

7    cause of action." *Polar Bear Prod. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). "It is

8    widely recognized that the separate-accrual rule attends the copyright statute of limitations. Under

9    that rule, when a defendant commits successive violations, the statute of limitations runs

10   separately from each violation." *Petrella*, 134 S. Ct. at 1969. "Each wrong gives rise to a discrete

11   'claim' that 'accrue[s]' at the time the wrong occurs," meaning that "each infringing act starts a

12   new limitations period." *Id.*

13         Defendant argues that Plaintiff's copyright claims that occurred prior to March 27, 2012

14   are time barred because they occurred outside of the three-year statute of limitations period. Cross

15   Mot. at 26:21-27:20. Defendant argues that "Phoenix has been using VMware's accused server

16   products since at least 2004," and that "Phoenix's knowledge of VMware's use of the Phoenix

17   BIOS in its ESX server product precludes [Plaintiff] from disclaiming knowledge as to VMware's

18   use of the Phoenix BIOS in its ESXi product." Cross Mot. at 27:8-27:11. In addition, Defendant

19   argues that "numerous high-ranking Phoenix executives and employees knew about VMware's

20   use [of the BIOS in its products] years before this suit was filed," and that such knowledge should

21   be imputed to Phoenix itself. Cross Mot. at 27:13-27:20. In response, Plaintiff argues that "much

22   of VMware's evidence of Phoenix's purported knowledge relates to employees with no

23   involvement in the parties' negotiations, no knowledge of the relevant license terms, and no basis

24   to evaluate whether VMware's use of [the] BIOS was infringing." Cross Opp. at 25:5-25:8.

25         The Ninth Circuit has held that "[i]n determining when an action has accrued under a

26   discovery-based statute of limitations, '[t]he question of when [the alleged wrongdoing] was or

27   should have been discovered is a question of fact. It may be decided as a matter of law only when

28   uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered

*United States District Court*
*Northern District of California*

1   the fraudulent conduct.'" *Nevada Power Co. v. Monsanto*, 955 F.2d 1304, 1307 (9th Cir. 1992).

2   Because the parties dispute when Plaintiff discovered or reasonably could have discovered

3   Defendant's allegedly infringing acts and the facts are neither uncontroverted nor irrefutable, the

4   Court finds that this question should be decided by a jury.

5           **iii.   Estoppel and Waiver**

6          Defendant argues that Plaintiff's claims are "independently barred by estoppel and

7   waiver." Cross Mot. at 26.  In a copyright case, "[f]our elements must be present to establish the

8   defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his

9   conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe

10  it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the

11  former's conduct to his injury." *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th

12  Cir. 1960).  Similarly, "[w]aiver is the intentional relinquishment of a known right after

13  knowledge of the facts." *Bettelheim v. Hagstrom Food Stores*, 113 Cal. App. 2d 873, 878 (1952).

14  To establish either of these defenses, the Court must thus be able to identify when Plaintiff learned

15  of the facts surrounding the alleged infringement.

16         Defendant attempts to rely on much of the same contested extrinsic evidence discussed

17  above to prove that Plaintiff knew VMware was incorporating the Phoenix BIOS program in its

18  accused ESXi product.  *See* Cross Mot. at 6:10-7:23, 25:8-25:9, 25:27-26:2 (arguing that Phoenix

19  knew VMware intended to use the Phoenix BIOS in its accused product after requesting and

20  receiving source code enhancements to enable it to do so in the early 2000s).  However, for the

21  reasons discussed above, this evidence creates a factual issue as to when Plaintiff learned of the

22  alleged infringement, which must be resolved by a jury.[2]

23          **iv.   Laches**

24         Defendant finally argues that Plaintiff's "unreasonable delay [in bringing this action] . . .

25

26  ───────────

[2] While Plaintiff contends that VMware's consent to a non-waiver clause in the MLA bars its
27  estoppel and waiver claims, Reply at 15:6-15:21, "[e]ven a waiver clause may be waived by
conduct," *see Bettelheim v. Hagstrom Food Stores*, 113 Cal. App. 2d 873, 878 (1952).  The Court
28  finds that summary judgment is not warranted on this basis, given the numerous disputed issues of
fact regarding the parties' course of dealing discussed throughout this order.

United States District Court
Northern District of California

1    for over 13 years after VMware's first use of the Phoenix BIOS in the accused products" "severely

2    prejudiced VMware" and bars Plaintiff's recovery. *See* Cross Mot. at 27:28. Defendant argues

3    that had Phoenix filed this action earlier, VMware could have amended the MLA so that

4    VMware's use of the BIOS program adequately complied with its terms, developed its own BIOS

5    program, or pursued a contract with a different BIOS vendor. *See id.* at 27:28-28:2. Instead,

6    Defendant asserts that Plaintiff "lay in wait" as VMware sold millions of copies of its ESXi

7    product, creating "exorbitant" royalty damages. *Id.* at 28:2-28:5. Defendant further argues that it

8    has suffered evidentiary prejudice, "as documents have been discarded and witnesses' memories

9    have faded." *Id.* at 28:11-28:17.

10         While the Supreme Court has held that courts "may take account of [a Plaintiff's] delay in

11   commencing suit" when "determining appropriate injunctive relief and assessing profits," it

12   cautioned that "laches may bar at the very threshold the particular relief requested by the plaintiff"

13   only in "extraordinary circumstances." *See Petrella*, 134 S. Ct. at 1977. Plaintiff argues that

14   Defendant's allegations that it "lay in wait" in order to run up the damages in this action are "bald

15   allegations" that do not meet the extraordinary circumstances threshold and must be assessed by a

16   fact finder at trial. *See* Cross Opp. at 28:11-28:17. While Defendant's argument has significant

17   persuasive force, the Court agrees that Defendant's allegations contain factual issues that are

18   inappropriate for resolution at the summary judgment stage.

19   **IV.    CONCLUSION**

20         For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment.

21   The Court also **DENIES** Defendant's motion for summary judgment, except that it **GRANTS** the

22   motion as to Plaintiff's contract claims on the ground that those claims are time-barred.

23   Defendant's remaining affirmative defenses are substantial, and it is far from certain that Plaintiff

24   would be able to overcome them at trial. Nevertheless, because Defendant's remaining defenses

25   turn on material issues of fact, the Court finds that they are inappropriate for decision at the

26   summary judgment stage, and Defendant's motion for summary judgment is therefore **DENIED**

27   as to those defenses.

28         The Court **SETS** a telephonic status conference for January 10, 2017 at 3:00 p.m. to

*United States District Court*
*Northern District of California*

discuss the impact of the summary judgment ruling on the timing of any renewed settlement

discussions and trial.  Counsel shall contact CourtCall at (866) 582-6878 to make arrangements for

the telephonic appearance.

**IT IS SO ORDERED.**

Dated: 1/6/2017

HAYWOOD S. GILLIAM, JR.
United States District Judge